# In the United States Court of Appeals for the Fifth Circuit

THE STATE OF LOUISIANA, BY AND THROUGH ITS ATTORNEY GENERAL, JEFF LANDRY; THE STATE OF ALABAMA, BY AND THROUGH ITS ATTORNEY GENERAL, STEVE MARCHALL; THE STATE OF FLORIDA, BY AND THROUGH ITS ATTORNEY GENERAL, ASHLEY MOODY; THE STATE OF GEORGIA, BY AND THROUGH ITS ATTORNEY GENERAL, CHRISTOPHER M. CARR; THE COMMONWEALTH OF KENTUCKY, BY AND THROUGH ITS ATTORNEY GENERAL, DANIEL CAMERON; THE STATE OF MISSISSIPPI, BY AND THROUGH ITS ATTORNEY GENERAL, LYNN FITCH; THE STATE OF SOUTH DAKOTA, BY AND THROUGH ITS GOVERNOR, KRISTI NOEM; THE STATE OF TEXAS, BY AND THROUGH ITS ATTORNEY GENERAL, KEN PAXTON; THE STATE OF WEST VIRGINIA, BY AND THROUGH ITS ATTORNEY GENERAL, PATRICK MORRISEY; THE STATE OF WYOMING, BY AND THROUGH ITS ATTORNEY GENERAL, BRIDGET HILL,

*Plaintiffs-Appellees*

v.

JOSEPH R. BIDEN, JR., IN HIS OFFICIAL CAPACITY AS PRESIDENT OF THE UNITED STATES; CECILIA ROUSE, IN HER OFFICIAL CAPACITY AS CHAIRWOMAN OF THE COUNCIL OF ECONOMIC ADVISERS; SHALANDA YOUNG, IN HER OFFICIAL CAPACITY AS ACTING DIRECTOR OF THE OFFICE OF MANAGEMENT AND BUDGET; KEI KOIZUMI, IN HIS OFFICIAL CAPACITY AS ACTING DIRECTOR OF THE OFFICE OF SCIENCE AND TECHNOLOGY POLICY; JANET YELLEN, SECRETARY, U.S. DEPARTMENT OF TREASURY; DEB HAALAND, SECRETARY, U.S. DEPARTMENT OF THE INTERIOR; TOM VILSACK, IN HIS OFFICIAL CAPACITY AS SECRETARY OF AGRICULTURE; GINA RAIMONDO, SECRETARY, U.S. DEPARTMENT OF COMMERCE; XAVIER BECERRA, SECRETARY, U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES; PETE BUTTIGIEG, IN HIS OFFICIAL CAPACITY AS SECRETARY OF TRANSPORTATION; JENNIFER GRANHOLM, SECRETARY, U.S. DEPARTMENT OF ENERGY; BRENDA MALLORY, IN HER OFFICIAL CAPACITY AS CHAIRWOMAN OF THE COUNCIL ON ENVIRONMENTAL QUALITY; MICHAEL S. REGAN, IN HIS OFFICIAL CAPACITY AS ADMINISTRATOR OF THE ENVIRONMENTAL

PROTECTION AGENCY; GINA MCCARTHY, IN HER OFFICIAL CAPACITY AS WHITE HOUSE NATIONAL CLIMATE ADVISOR; BRIAN DEESE, IN HIS OFFICIAL CAPACITY AS DIRECTOR OF THE NATIONAL ECONOMIC COUNCIL; JACK DANIELSON, IN HIS OFFICIAL CAPACITY AS EXECUTIVE DIRECTOR OF THE NATIONAL HIGHWAY TRAFFIC SAFETY ADMINISTRATION; UNITED STATES ENVIRONMENTAL PROTECTION AGENCY; UNITED STATES DEPARTMENT OF ENERGY; UNITED STATES DEPARTMENT OF TRANSPORTATION; UNITED STATES DEPARTMENT OF AGRICULTURE; UNITED STATES DEPARTMENT OF INTERIOR; NATIONAL HIGHWAY TRAFFIC SAFETY ADMINISTRATION; INTERAGENCY WORKING GROUP ON SOCIAL COST OF GREENHOUSE GASES, *Defendants-Appellants*

Appeal from the United States District Court for the Western District of Louisiana No. 2:21-cv-1074 (Hon. James D. Cain, Jr.)

## BRIEF FOR APPELLEES

TYLER R. GREEN
JEFFREY S. HETZEL
CONSOVOY MCCARTHY PLLC
222 S. Main Street, 5th Floor
Salt Lake City, UT 84101
(703) 243-9423

JEFF LANDRY
  Attorney General
ELIZABETH B. MURRILL*
  Solicitor General
*Counsel of Record
JOSEPH S. ST. JOHN
  Deputy Solicitor General
LOUISIANA DEPARTMENT OF JUSTICE
1885 N. Third Street
Baton Rouge, LA 70802
(225) 326-6766

June 16, 2022

*Counsel for Appellees*

## CERTIFICATE OF INTERESTED PARTIES

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this court may evaluate possible disqualification or recusal.

**Parties:**

**Plaintiff-Appellees**: States of Louisiana, Alabama, Florida, Georgia, Kentucky, Mississippi, South Dakota, Texas, West Virginia, and Wyoming.

**Defendant-Appellants**: Joseph R. Biden, Jr., in his official capacity as President of the United States; Cecilia Rouse, in her official capacity as Chairwoman of the Council of Economic Advisers; Shalanda Young, in her official capacity as Acting Director of the Office of Management and Budget; Kei Koizumi, in his official capacity as Acting Director of the Office of Science and Technology Policy; Janet Yellen, in her official Capacity as Secretary of the Treasury; Deb Haaland, in her official capacity as Secretary of the Interior; Tom Vilsack, in his official capacity as Secretary of Agriculture; Gina Raimondo, in her official capacity as Secretary of Commerce; Xavier Becerra, in his official capacity as

Secretary of Health and Human Services; Pete Buttigieg, in his official capacity as Secretary of Transportation; Jennifer Granholm, in her official capacity as Secretary of Energy; Brenda Mallory, in her official capacity as Chairwoman of the Council on Environmental Quality; Michael S. Regan, in his official capacity as Administrator of the Environmental Protection Agency; Gina McCarthy, in her official capacity as White House National Climate Advisor; Brian Deese, in his official capacity as Director of the National Economic Council; Jack Danielson, in his official capacity as Executive Director of the National Highway Traffic Safety Administration; U.S. Environmental Protection Agency; U.S. Department of Energy; U.S. Department of Transportation; U.S. Department of Agriculture; U.S. Department of the Interior; National Highway Traffic Safety Administration; Interagency Working Group on the Social Cost of Greenhouse Gases.

**<u>Counsel:</u>**

**<u>For Plaintiffs-Appellees</u>:**

Jeff Landry

Elizabeth B. Murrill

Joseph S. St. John

Shae McPhee

Steve Marshall

Edmund G. Lacour Jr.

Ashley Moody

Henry C. Whitaker

Rachel Siegel

Christopher M. Carr

Stephen Petrany

Daniel Cameron

Matt Kuhn

Lynn Fitch

Justin L. Matheny

Katie Hruska

Ken Paxton

Eric Hudson

Patrick Morrisey

Lindsay S. See

Bridget Hill

James Kaste

Travis Jordan

John B Dunlap

Jennifer Ann

Tyler R Green

Jeffrey S. Hetzel

Daniel Joseph Shapiro

Victor Maddox

Marc Manley

**<u>For Defendants</u>:**

Brian M. Boynton

Brandon Bonaparte Brown

Sarah E. Harrington

Michael S. Raab

Jeffrey E. Sandberg

Thomas Pulham

Stephen Michael Pezzi

Cody Taylor Knapp

In accordance with Federal Rule of Appellate Procedure 26.1, the undersigned counsel certifies that none of the named Appellees have any parent corporation and that no publicly held corporation holds more than 10% of their stock.

_/s/ Elizabeth B. Murrill_
Counsel for Appellees
Dated: June 16, 2022

## STATEMENT REGARDING ORAL ARGUMENT

Plaintiff States respectfully request oral argument. The district court preliminarily enjoined the federal government from enforcing a regulatory action that will affect a wide range of administrative activity. The injunction raises important statutory and administrative questions. Plaintiff States believe that oral argument would facilitate the Court's consideration of the case.

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PARTIES ...........................................i

STATEMENT REGARDING ORAL ARGUMENT..................................vi

TABLE OF AUTHORITIES....................................................................ix

INTRODUCTION .................................................................................1

STATEMENT OF ISSUES......................................................................3

STATEMENT OF THE CASE ................................................................3

    I.    CIRCULAR A-4'S LONGSTANDING RULEMAKING PROCEDURES. ...3

    II.    THE CREATION AND DEVELOPMENT OF SC-GHG ESTIMATES.....8

        A.    SC-GHG Estimates in the Obama Administration. ........9

        B.    SC-GHG Estimates in the Trump Administration........16

    III.    PRESIDENT BIDEN ISSUES EO13990 REQUIRING AGENCIES TO EMPLOY SC-GHG ESTIMATES CREATED BY A NEW IWG. ........18

        A.    Executive Order 13990....................................................18

        B.    The Biden IWG Issues SC-GHG Estimates Effectively Identical to the Obama IWG's Discredited Estimates...18

    IV.    THE STATES OBTAIN INJUNCTIVE RELIEF. ...........................20

SUMMARY OF ARGUMENT .................................................................23

STANDARD OF REVIEW......................................................................25

ARGUMENT .......................................................................................26

I.    THE DISTRICT COURT HAD JURISDICTION. ...............................26

    A.    Plaintiff States Have Standing. .......................................26

    B.    Plaintiff States' Claims Are Ripe. ....................................30

II.   THE DISTRICT COURT'S PRELIMINARY INJUNCTION WAS
    LAWFUL. ....................................................................................39

    A.    Plaintiff States Have Multiple Causes of Action. ..........39

    B.    The Executive Order and Estimates Are Unlawful for
           Several Independently Sufficient Reasons....................45

       1.  The Estimates Are Unauthorized and Contravene
           Several Statutes. ..............................................................46

       2.  The Estimates Did Not Receive Notice and Comment..50

       3.  The Estimates Are Arbitrary and Capricious. ...............52

    C.    The Equitable Factors Support an Injunction. ..............53

    D.    The Injunction Is Appropriately Tailored to Address
           Plaintiff States' Harms. ..................................................56

CONCLUSION ..........................................................................................59

CERTIFICATE OF SERVICE...................................................................64

CERTIFICATE OF COMPLIANCE ........................................................65

# TABLE OF AUTHORITIES

**Cases**

*Alabama-Coushatta Tribe of Texas v. United States,*
  757 F.3d 484 (5th Cir. 2014) ................................................................. 39

*Am. Great Lakes Ports Ass'n v. Schultz,*
  962 F.3d 510 (D.C. Cir. 2020) ...................................................... 56, 57

*Ancient Coin Collectors Guild v. U.S. Customs & Border Prot.,*
  801 F. Supp. 2d 383 (D. Md. 2011) ............................................ 43, 45

*Arkla Expl. Co. v. Tex. Oil & Gas Corp.,*
  734 F.2d 347 (8th Cir. 1984) ................................................................. 49

*Associated Builders & Contractors of Se. Tex. v. Rung,*
  2016 WL 8188655 (E.D. Tex. Oct. 24, 2016) .............................. 44, 45

*BNSF Ry. Co. v. EEOC,*
  385 F.Supp.3d 512 (N.D. Tex. 2018) ................................................. 42

*BST Holdings, L.L.C. v. Occupational Safety & Health Admin.,*
  17 F.4th 604 (5th Cir. 2021) ................................................................. 56

*Catholic Health Initiatives v. Sebelius,*
  617 F.3d 490 (D.C. Cir. 2010) ............................................................. 46

*Chamber of Com. v. Reich,*
  74 F.3d 1322 (D.C. Cir. 1996) ............................................................. 44

*City & Cty. of San Francisco v. Trump,*
  897 F.3d 1225 (9th Cir. 2018) ...................................................... 37, 45

*City of Dallas, Tex. v. Hall,*
  2007 WL 3257188 (N.D. Tex. Oct. 29, 2007) ................................ 45

*Corrosion Proof Fittings v. EPA,*
  947 F.2d 1201 (5th Cir. 1991) ............................................................. 48

*CREW v. Office of Admin.*,
566 F.3d 219 (D.C. Cir. 2009) ........................................................ 41

*Ctr. For Biological Diversity v. NHTSA*,
538 F.3d 1172 (9th Cir. 2008) ......................................................... 9

*DeJoria v. Maghreb Petroleum Expl., S.A.*,
935 F.3d 381 (5th Cir. 2019) ........................................................ 29

*Dep't of Com. v. New York*,
139 S. Ct. 2551 (2019) ................................................................. 52

*Dep't of Transp. v. Pub. Citizen*,
541 U.S. 752 (2004) ..................................................................... 17

*EarthReports, Inc. v. Fed. Energy Regulatory* Comm'n,
828 F.3d 949 (D.C. Cir. 2016) ........................................................ 16

*El Paso Cty., Texas v. Trump*,
982 F.3d 332 (5th Cir. 2020) ........................................................ 28

*Elec. Power Co. v. EPA*,
920 F.3d 999 (5th Cir. 2019) ........................................................ 52

*Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*,
561 U.S. 477 (2010) ....................................................................... 3

*Hias, Inc. v. Trump*,
985 F.3d 309 (4th Cir. 2021) .................................................... 37, 45

*Huawei Techs. USA, Inc. v. FCC*,
2 F.4th 421 (5th Cir. 2021) .......................................................... 52

*Laub v. U.S. Dep't of Interior*,
342 F.3d 1080 (9th Cir. 2003) .................................................. 35, 37

*League of Conservation Voters v. Trump*,
303 F. Supp. 3d 985 (D. Alaska 2018) ............................................ 45

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*,
572 U.S. 118 (2014) ............................................................ 26

*Louisiana v. Biden*,
543 F. Supp. 3d 388 (W.D. La. 2021) ............................ 45, 57

*Lujan v. National Wildlife Federation*,
497 U.S. 871 (1990) ....................................................... 34, 39

*Massachusetts v. E.P.A.*,
549 U.S. 497 (2007) ............................................................. 8

*Meyer v. Bush*,
981 F.2d 1288 (D.C. Cir. 1993) ..................................... 40, 41

*Moore v. Brown*,
868 F.3d 398 (5th Cir. 2017) .............................................. 26

*Mountain States Legal Found. v. Bush*,
306 F.3d 1132 (D.C. Cir. 2002) ..................................... 43, 45

*Nat'l Ass'n of Home Builders v. Defs. of Wildlife*,
551 U.S. 644 (2007) ............................................................ 53

*Nat'l Fed'n of Indep. Bus. v. Dep't of Lab.*,
142 S. Ct. 661 (2022) .......................................................... 47

*Nat'l Park Hospitality Ass'n v. Dep't of the Interior*,
538 U.S. 803 (2003) ...................................................... 37, 38

*Nevada v. United States Dep't of Lab.*,
275 F. Supp. 3d 795 (E.D. Tex. 2017) ................................ 31

*Ohio Forestry Ass'n, Inc. v. Sierra Club*,
523 U.S. 726 (1998) ...................................................... 33, 37

*Pac. Legal Found. v. Council on Envtl. Quality*,
636 F.2d 1259 (D.C.Cir.1980) ............................................ 40

*Rosebud Sioux Tribe v. Trump*,
   428 F. Supp. 3d 282 (D. Mont. 2019) .................................................. 45

*Rushforth v. Council of Econ. Advisers*,
   762 F.2d 1038 (D.C. Cir. 1985) ...................................................... 40, 42

*Sierra Club v. U.S. Fish & Wildlife Serv.*,
   245 F.3d 434 (5th Cir. 2001) ......................................................... 25, 50

*Soucie v. David*,
   448 F.2d 1067 (D.C. Cir 1971) ................................................. 24, 40, 42

*State of La. v. Dep't of Energy*,
   507 F. Supp. 1365 (W.D. La. 1981) ..................................................... 38

*State v. Bureau of Land Mgmt.*,
   286 F. Supp. 3d 1054 (N.D. Cal. 2018) .................................................. 6

*Strata Prod. Co. v. Jewell*,
   2014 WL 12789010 (D.N.M. Aug. 11, 2014) ......................................... 35

*Summers v. Earth Island Inst.*,
   555 U.S. 488 (2009) ........................................................................ 28

*Texans for Free Enter. v. Texas Ethics Comm'n*,
   732 F.3d 535 (5th Cir. 2013) ............................................................ 25

*Texas v. Biden*,
   20 F. 4th 928 (5th Cir. 2021) ....................................................... 25, 53

*Texas v. EEOC*,
   933 F.3d 433 (5th Cir. 2019) ............................................. 25, 27, 54, 37

*Texas v. United States*,
   201 F. Supp. 3d 810 (N.D. Tex. 2016) ................................................. 32

*Texas v. United States*,
   497 F.3d 491 (5th Cir. 2007) ............................................. 23, 31, 32, 33

*Texas v. United States,*
   524 F. Supp. 3d 598 (S.D. Tex. 2021) ............................................28, 29

*Texas v. United States,*
   809 F.3d 134 (5th Cir. 2015) ....................................................29, 30, 55

*Toilet Goods Ass'n v. Gardner,*
   360 F.2d 677 (2d Cir. 1966) (Friendly, J.), *aff'd sub nom.* 387 U.S.
   158 (1967), *and aff'd,* 387 U.S. 167 (1967)...........................................28

*United States v. Johnson,*
   632 F.3d 912 (5th Cir. 2011) ................................................................51

*United States v. Riccardi,*
   989 F.3d 476 (6th Cir. 2021) ........................................................25, 50

*Venetian Casino Resort, L.L.C. v. E.E.O.C.,*
   409 F.3d 359 (D.C. Cir. 2005) ......................................................32, 33

*W. Energy All. v. Jewell,*
   2017 WL 3600740 (D.N.M. Jan. 13, 2017) ..........................................39

*W. Watersheds Project v. Bureau of Land Mgmt.,*
   629 F. Supp. 2d 951 (D. Ariz. 2009) ....................................................45

*Wages & White Lion Invs., LLC v. FDA,*
   16 F.4th 1130 (5th Cir. 2021) ..............................................................52

*Wyoming v. United States Dep't of the Interior,*
   493 F. Supp. 3d 1046 (D. Wyo. 2020) ......................................6, 48, 49

*Zero Zone v. Department of Energy,*
   832 F.3d 654 (7th Cir. 2016) ................................................................36

**Statutes**
30 U.S.C. § 187.......................................................................................49

42 U.S.C. §6295(o)(2)(B)(i) ............................................................24, 47

42 U.S.C. §7401(b)(1) ..........................................................................24, 48

49 U.S.C. §32902(f) .......................................................................................47

**Other Authorities**

68 Fed. Reg. 58366 (Oct. 9, 2003) ..............................................................5

78 Fed. Reg. 70586 (Nov. 26, 2013) .........................................................11

79 Fed. Reg. 4359 (Jan. 27, 2014) ............................................................11

82 Fed. Reg. 5650 (Jan. 18, 2017) ............................................................15

86 Fed. Reg. 7037 (Jan. 20, 2021) ............................................................18

Arden Rowell, *Foreign Impacts and Climate Change*, 39 Harv. Envtl. L.
   Rev. 371 (2015) .....................................................................................6, 14

Dep't of Energy, Proposed Rule, *Energy Conservation Program: Energy
   Conservation Standards for Variable Refrigerant Flow Multi-Split
   Air Conditioners and Heat Pumps*, 87 Fed. Reg. 11335
   (Mar. 1, 2022) ....................................................................................20, 58

Dep't of Energy, Proposed Rule, *Energy Conservation Program: Energy
   Conservation Standards for Variable Refrigerant Flow Multi-Split Air
   Conditioners and Heat Pumps; Clarification* (Mar. 9, 2022),
   perma.cc/DPE5-VVKJ ...........................................................................20

DOE, *Energy Conservation Program: Energy Conservation Standards
   for Commercial Refrigeration Equipment*, 78 Fed. Reg. 55890 (Sept.
   11, 2013) ...................................................................................................13

DOI, BLM Utah 2022 First Competitive Oil and Gas Lease Sale,
   DOI-BLM-UT-0000-2021-0007-EA (Apr. 18, 2022),
   https://bit.ly/38s9qlc ..............................................................................54

*Dominion Cove Point LNG, LP*, 151 F.E.R.C. ¶61,095 (2015) ..............16

Executive Order 12866 .............................................................. 4

Executive Order 13783 ............................................................ 16

Final Environmental Impact Statement for Proposed Energy
     Conservation Standards for Manufactured Housing,
     https://bit.ly/3wsqpvN (Apr. 2022) ..................................... 55

GAO, *Regulatory Impact Analysis: Development of Social Cost of
     Carbon Estimates* (July 2014) ............................................ 36

Interagency Working Group on Social Cost of Greenhouse Gases,
     Technical Support Document: Social Cost of Carbon, Methane, and
     Nitrous Oxide, Interim Estimates Under Executive Order 13990 (Feb.
     26, 2021), bit.ly/3HUKUVr ................................................ 18, 19, 48, 49

IWG, *Response to Comments: Social Cost of Carbon for Regulatory
     Impact Analysis Under Executive Order 12866* (July 2015) .............. 11

Kate C. Shouse, Cong. Research Serv., EPA's Proposal to Repeal the
     Clean Power Plan: Benefits and Costs (Feb. 28, 2018) ..................... 17

Kevin D. Dayaratna & David W. Kreutzer, *Loaded DICE: An EPA
     Model Not Ready for the Big Game*, Heritage Foundation
     Backgrounder No. 2860 (Nov. 21, 2013), herit.ag/3QlajgG ................. 13

Nina A. Mendelson & Jonathan B. Wiener, *Responding to Agency
     Avoidance of OIRA*, 37 Harv. J.L. & Pub. Pol'y 447 (2014) .............. 4, 5

## INTRODUCTION

For a year now, Appellants have represented to a federal district court that—despite Executive Order 13990's plain text—the Executive Branch does not rely on the Internal Working Group's Estimates to justify (or reject) administrative actions and that therefore Plaintiff States' claims were not justiciable or were meritless. But now, after the district court enjoined the Estimates' usage, Appellants have dramatically changed course and admit this was untrue. The injunction, they *now* say, will have dramatic consequences and interfere with the Executive Branch's ability to function. The extent of the contradiction between Appellants' brief and their prior representations—and even among parts of Appellants' brief—is striking.

Signing Executive Order 13990 was one President Biden's first official actions upon taking office. Among other things, EO13990 created a new federal agency—the Interagency Working Group. It also ordered the IWG to estimate the "social costs" of greenhouse gas emissions—that is, to try to calculate (in dollar values) *global* harms attendant to emissions of carbon, methane, and nitrous oxide. EO13990 ordered federal agencies to immediately use the IWG's numerical estimates when conducting the cost/benefit analysis required for all regulatory decisions.

As a result, a vast range of federal administrative activities became contingent on and reshaped by the IWG's SC-GHG Estimates.

To demonstrate they are likely to succeed on the merits, Appellants must argue that the IWG's Estimates are *not* in use and do not raise major questions. *See, e.g.*, Gov. Br. 20 ("Plaintiffs have an abstract disagreement over government policy that has yet to be applied to them."). But to try to prove that the balance of harms tips to them, Appellants must concede that federal agencies *do* use the IWG's Estimates and that these represent major questions. Stay Mot. 26-27 (after the district court enjoined the use of the SC-GHG Estimates, "work surrounding various public-facing rules, grants, leases, permits, and other projects—including potential oil-and-gas projects in Louisiana— has been delayed or stopped altogether").

Plaintiff States agree—as the district court properly did—that the IWG's Estimates *are* in use across the Executive Branch and *do* represent questions of major political, economic, and social importance. They are wreaking harmful consequences and lack any legal authority. The district court's injunction was lawful and should be affirmed.

## STATEMENT OF ISSUES

1.      Whether the district court had jurisdiction.

2.      Whether the district court abused its wide discretion in granting the preliminary injunction after evaluating unrebutted evidence presented by the States.

## STATEMENT OF THE CASE

### I.      CIRCULAR A-4'S LONGSTANDING RULEMAKING PROCEDURES.

One of the foremost checks on the "growth of the Executive Branch, which now wields vast power and touches almost every aspect of daily life," *Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 499 (2010), is the Administrative Procedure Act. The APA mandates that agencies take action only based on express legal authority, in a transparent manner, with opportunity for robust public input, in a nonarbitrary manner, and with robust judicial review. Courts have vigorously enforced the APA's requirements to ensure that the administrative state stays within the bounds set by the Constitution and Congress.

Another check on the growth of the administrative state is the decades-old bipartisan consensus on cost/benefit analysis. Presidents Nixon, Ford, Carter, Reagan, and Clinton required agencies to perform

cost-benefit analysis before regulating. *See* Mendelson & Wiener, *Responding to Agency Avoidance of OIRA*, 37 Harv. J. L. & Pub. Pol'y 447, 454-57 (2014). President Clinton memorialized this consensus in Executive Order 12866, which instructs agencies "[i]n deciding whether and how to regulate" to "assess all costs and benefits of available regulatory alternatives, including the alternative of not regulating." ROA.627 (EO12866).

To implement EO12866 and ensure agencies use a "standardiz[ed]" way of "measur[ing] and report[ing]" the "benefits and costs of Federal regulatory actions," the Office of Management and Budget issued Circular A-4 in 2003. ROA.689 (Circular A-4). Part compilation of decades of best regulatory practices and part aggregation of public comments, expert peer review, and interagency considerations, Circular A-4 has become the cornerstone of regulatory analysis in the Executive Branch. ROA.2599.

Circular A-4 gives "highly detailed guidance to the agencies on the key elements of a 'good regulatory analysis' under E.O. 12866," including "a clear baseline for comparative purposes, specifically stated assumptions, an assessment of the sensitivity of the analytical results to

changes in those assumptions, and attention to ancillary impacts." Mendelson & Wiener, *supra*, at 457-58. Circular A-4 was issued after an *extensive* and *transparent* process of peer and interagency review, and after public notice and comment. *See* ROA.589 ("In developing this Circular, OMB first developed a draft that was subject to public comment, interagency review, and peer review."); 68 Fed. Reg. 58366 (Oct. 9, 2003); ROA.650 ("OMB seeks public comment on *all aspects* of this Draft Report.") (emphasis added), ROA.671 ("Before issuing the Circular, this draft will go through a process of peer review, public comment and interagency review."); *see also* ROA.2445-47.

As relevant here, Circular A-4 contains two cornerstone instructions. First, agencies are to consider domestic—rather than global—costs and benefits. Circular A-4 unambiguously instructs agencies to make domestic effects the basis of their analysis: "Your analysis should focus on benefits and costs that accrue *to citizens and residents of the United States*. Where you choose to evaluate a regulation that is likely to have effects beyond the borders of the United States, these effects should be reported separately." ROA.703 (emphasis added).

Courts have recognized the requirement to focus on domestic, rather than global, effects. *See Wyoming v. United States Dep't of the Interior*, 493 F. Supp. 3d 1046, 1080-81 (D. Wyo. 2020) (noting that Circular A-4 mandates a national focus); *State v. Bureau of Land Mgmt.*, 286 F. Supp. 3d 1054, 1069 (N.D. Cal. 2018) (Circular A-4 "does not specifically mandate that agencies consider global impacts."). Reflecting this directive, "the typical agency practice is, in fact, to leave foreign impacts out of cost-benefit analyses entirely." Arden Rowell, *Foreign Impacts and Climate Change*, 39 Harv. Envtl. L. Rev. 371, 373 (2015); ROA.2599 ("Circular A-4 still requires that analysis results be presented … for domestic benefits alone.").

Second, agencies must use discount rates of 3 and 7 percent. As Circular A-4 explains, discount rates matter in regulatory analysis because "[b]enefits and costs do not always take place in the same time period," and "it is incorrect simply to add all of the expected net benefits or costs without taking account of when the[y] actually occur." ROA.719. "Benefits or costs that occur sooner are generally more valuable" because people "plac[e] a higher value on current consumption than on future consumption." ROA.720. "To reflect this preference, a discount factor

should be used to adjust the estimated benefits and costs for differences in timing." *Id.* "The further in the future the benefits and costs are expected to occur, the more they should be discounted." *Id.* "When, and only when, the estimated benefits and costs have been discounted, they can be added to determine the overall value of net benefits." *Id.*

Reflecting these economic realities, Circular A-4 instructs agencies to apply discount rates of both 3 percent and 7 percent when conducting regulatory cost/benefit analysis. OMB did not randomly select these discount rates. The Executive Branch had used a 7-percent rate for more than a decade before Circular A-4 that itself was the product of "extensive internal review and public comment." ROA.721. The Executive Branch had long used a 7-percent discount rate because it "approximates the opportunity cost of capital, and it is the appropriate discount rate whenever the main effect of a regulation is to displace or alter the use of capital in the private sector." *Id.* But Circular A-4 also recognizes, based on material accumulated in OMB's extensive internal and public review, that a lower discount rate may be appropriate in certain circumstances. So Circular A-4 instructs agencies also to "provide estimates of net benefits using both 3 percent and 7 percent." ROA.722.

## II.    THE CREATION AND DEVELOPMENT OF SC-GHG ESTIMATES.

Greenhouse gas emissions inhere in modern human life and society—encompassing "everything airborne, from Frisbees to flatulence." *Massachusetts v. E.P.A.*, 549 U.S. 497, 558 n.2 (2007) (Scalia, J., dissenting). The greenhouse gases at issue in this case—carbon dioxide, methane, and nitrous oxide—are ubiquitous byproducts of everyday American life. Virtually every imaginable American activity, from energy production to agriculture to waste disposal, produces these gases.

Carbon dioxide, for example, "enters the atmosphere through burning fossil fuels (coal, natural gas, and oil), solid waste, trees and other biological materials, and also as a result of certain chemical reactions (e.g., manufacture of cement)." ROA.2600. It is also emitted by the natural processes of human beings and other respiratory organisms. Methane emissions are also ever-present parts of the economy; they are "emitted during the production and transport of coal, natural gas, and oil [and] also result from livestock and other agricultural practices, land use and by the decay of organic waste in municipal solid waste landfills." *Id.* And "[n]itrous oxide is emitted during agricultural, land use, industrial

activities, combustion of fossil fuels and solid waste, as well as during treatment of wastewater." *Id.* In fact, 75 percent of such emissions are caused by fertilizing crops. *Id.*

## A. SC-GHG Estimates in the Obama Administration.

Because the Biden Administration's actions challenged here effectively resurrect the Obama Administration's efforts, this story starts with those efforts. No statute requires agencies to consider a "social cost" of carbon (or any other greenhouse gas) as part of their regulatory cost/benefit analysis in rulemakings. But in 2008, the Ninth Circuit held that the National Highway Traffic Safety Administration must account for the economic effects of reductions of carbon dioxide emissions when analyzing the impacts of fuel-economy standards. *See Ctr. For Biological Diversity v. NHTSA*, 538 F.3d 1172 (9th Cir. 2008).

The Obama Administration seized this holding as an opening to remake the American economy without congressional action. After the Ninth Circuit's decision, President Obama in 2009 convened an Interagency Working Group to establish estimates of the "Social Cost of Carbon" (SCC) that all agencies must account for in their regulatory cost/benefit analysis. The Obama IWG issued several iterations of the SCC estimates over the course of that Administration. And in 2016, the

IWG released estimates for the Social Cost of Methane (SCM) and Social Cost of Nitrous Oxide (SCN). These estimates, which now form the basis of the Biden Social Cost of Greenhouse Gases (SC-GHG) Estimates, broke from the longstanding requirements of the APA and Circular A-4 and were not the product of reasoned decisionmaking.

The Obama IWG's first round of "interim" SCC estimates "did not undertake any original analysis. Instead, it combined SCC estimates from the existing literature to use as interim values." ROA.742**Error! Bookmark not defined.**. Not until the Spring of 2010 did the IWG issue a "technical support document" in which it presented final SCC estimates and described its methodology. *See id.* IWG purported to use Circular A-4 as its starting point but expressly rejected two of Circular A-4's fundamental tenets of good regulatory practice. First, the IWG replaced Circular A-4's discount rates—3 and 7 percent—with lower rates of 2.5, 3, and 5 percent. ROA.739. Second, the IWG focused on global rather than domestic effects. ROA.741-42. The IWG also ignored the APA by failing to hold a dedicated public comment period for the SCC estimates.

In 2013, the IWG issued another technical support document in which it revised the SCC estimates. ROA.826. Although the IWG stuck

with its underlying methodologies, it applied new versions of underlying models that resulted in a nearly twofold increase of the SCC estimate over the 2010 SCC estimates. ROA.827. Yet again, the IWG failed to solicit public comment. This massive increase, however, attracted enough public attention that OMB initiated the first public review and comment period for the IWG's SCC estimates. *See* ROA.855 (78 Fed. Reg. 70586 (Nov. 26, 2013)); ROA.857 (79 Fed. Reg. 4359 (Jan. 27, 2014)). OMB received over 100 unique comments that "covered a wide range of topics including the technical details of the modeling, the aggregation and presentation of the results, and the process by which the SCC estimates were derived." ROA.976-77 (IWG, *Response to Comments: Social Cost of Carbon for Regulatory Impact Analysis Under Executive Order 12866* (July 2015)).

But OMB rejected and ignored these comments by calling them "out of scope" of the call for comments. ROA.975 ("OMB further clarified that it was not requesting comments on the three peer reviewed [Models] themselves."). Even so, the Obama Administration kept relying upon the 2013 estimates "until revisions based on the many thoughtful public comments we have received and the independent advice of the Academies

can be incorporated into the estimates[.]" ROA.977. Such revisions never came. Neither OMB nor the IWG ever did address the "thoughtful" and "technical" public comments, and thus never revised the SCC values in response to them.

Finally, in 2016, the IWG issued a minor revision to the SCC estimates in which it again held off making substantive revisions while it waited on a report of the National Academies of Sciences, Engineering, and Medicine. ROA.1040. The IWG also issued a final addendum, which did not change the SCC estimates, but instead established estimates for the SCM and SCN using the same methods and models as those underlying the SCC estimates.

The Obama IWG's process was not a model of reasoned decisionmaking for many reasons. *First*, many have noted the sheer arbitrariness of the time horizons for the SCC estimates. The Natural Resource Council admitted that the SCC estimates "suffer from uncertainty, speculation, and lack of information" about "(1) future emissions of GHGs; (2) the effects of past and future emissions on the climate system, (3) the impact of changes in climate on the physical and biological environment, and (4) the translation of these environmental

impacts into economic damages." ROA.904. The SCC was based on models that used a *three-hundred-year* time horizon, meaning they purport to predict political, technological, economic, social, geopolitical developments *three centuries into the future. See* Kevin D. Dayaratna & David W. Kreutzer, *Loaded DICE: An EPA Model Not Ready for the Big Game*, Heritage Foundation Backgrounder No. 2860 (Nov. 21, 2013), herit.ag/3QlajgG.

*Second*, the SCC estimates rested on "ma[d]e up" values for their damages functions. ROA.819. Even Obama Administration agencies acknowledged the "tension between the goal of producing quantified estimates of the economic damages from an incremental ton of carbon" and "the limits of existing efforts to model these effects," including the need for "improvements in modeling." ROA.906 (DOE, *Energy Conservation Program: Energy Conservation Standards for Commercial Refrigeration Equipment*, 78 Fed. Reg. 55890, 55947 (Sept. 11, 2013)); *see also* Loaded DICE, *supra*, at 9 ("[T]he loss functions of the DICE model and the FUND model are arbitrarily chosen.").

*Third*, even though the relevant statutes direct agencies to consider domestic—not global—costs and benefits, the 2013 SCC estimates were

based upon global harms. That is especially noteworthy given that "between 77 and 93 percent of the benefits from reductions in $CO_2$ emissions resulting from this regulation [would] be captured by foreigners, not by Americans." ROA.850. Even scholars sympathetic to the Obama Administration's efforts recognized that this was a radical break from the past. *See* Arden Rowell, *Foreign Impacts and Climate Change*, 39 Harv. Envtl. L. Rev. 371, 373 (2015) ("[T]he decision to count global impacts … constitutes a bold diversion from existing regulatory policy."). The IWG and agencies failed to even consider their statutory authority to make this radical departure. *See id.* at 375 ("[A]gencies implementing these statutes have inexplicably failed to systematically examine their own statutory authority to apply a globally scoped SCC. As a result, recent rules based on the globally scoped SCC are vulnerable to challenge as exceeding agencies' statutory authority, and as arbitrary and capricious.").

*Fourth*, the IWG never gave the public a full and fair opportunity to comment on the SCC estimates or the underlying models. Instead, different parts of the SCC estimates appeared to be up for comment in different regulatory proceedings at different times over the course of the

Administration. *See, e.g.*, ROA.975 ("OMB further clarified that it was not requesting comments on the three peer reviewed [integrated assessment models, or] [Models] themselves."). The one time that the Administration accepted public comment on the SCC estimates specifically, it rejected and ignored comments on the underlying models and gave the public the runaround by delaying (and then never providing) substantive revisions. ROA.977. And the SCM and SCN were never put out for public comment individually and were subject to public scrutiny only in a single DOE rulemaking. *See* ROA.2517**Error! Bookmark not defined.**; 82 Fed. Reg. 5650 (Jan. 18, 2017).

*Fifth*, many noted the sheer substantive uncertainty of the SCC-estimate enterprise. *See*, *e.g.*, ROA.1582 (noting "methodological concerns," including that "[n]o estimates of impacts are comprehensive at this time," "many of the risks are difficult to estimate and value," and "[e]conomists do not agree on the appropriate discount rate(s) to use for a multi-generational, largely non-market issue such as human-induced climate change")).

Through all of this, OMB remained clear that "[t]he 7 percent rate remains an appropriate estimate of the average before-tax rate of return

to provide capital in the U.S. economy." ROA.2554. And the few agencies that were not bound to use the new estimates, such as the Federal Energy Regulatory Commission, refused to employ them due to their manifest flaws. FERC found that "it would not be appropriate or informative to use" IWG's SCC estimates "for three reasons: the lack of consensus on the appropriate discount rate leads to 'significant variation in output[,]' the tool 'does not measure the actual incremental impacts of a project on the environment[,]' and 'there are no established criteria identifying the monetized values that are to be considered significant for NEPA purposes.'" *EarthReports, Inc. v. FERC,* 828 F.3d 949, 956 (D.C. Cir. 2016) (quoting *Dominion Cove Point LNG, LP*, 151 F.E.R.C. ¶61,095 (2015)). The D.C. Circuit upheld FERC's "finding [that] the tool [is] inadequately accurate." *Id.*

## B. SC-GHG Estimates in the Trump Administration.

In light of the significant flaws in the Obama IWG's SCC, SCM, and SCN estimates, President Trump issued Executive Order 13783, which disbanded the IWG and rescinded its technical support documents. EO13783 also directed agencies to return to Circular A-4's methodologies to guide their analysis of the value of changes in greenhouse gas emissions. Agencies followed those instructions to return to Circular A-

4's longstanding 3- and 7-percent discount rates and focus on domestic costs and benefits. For example, the EPA promulgated SCC values based upon Circular A-4's methodologies. ROA.2557-2580.

Doing so, EPA found the SCC to be $7 per metric ton at a 3 percent discount rate and $1 per metric ton at a 7 percent discount rate. ROA.1924-25. EPA also determined the SCM to be $184 per metric ton at a 3 percent discount rate and $57 per metric ton at a 7 percent discount rate. *Id.* NHTSA employed Circular A-4's methodology to determine that the SCN was $2,820 per metric ton. ROA.1925.

CEQ also issued a final rule clarifying that NEPA does not allow agencies to consider effects that are "remote in time, geographically remote, or the result of a lengthy causal chain." ROA.1990. Instead, agencies must only consider effects that are "reasonably foreseeable" and bear a "reasonably close causal relationship" to the proposed action, "analogous to proximate cause in tort law." *Id.* (citing *Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752, 767 (2004)).

### III. President Biden Issues EO13990 Requiring Agencies to Employ SC-GHG Estimates Created by a New IWG.

#### A. Executive Order 13990.

On January 20, 2021, President Biden issued Executive Order 13990. 86 Fed. Reg. 7037 (Jan. 20, 2021). Section 5 of EO13990 directs federal agencies to "capture the full costs of greenhouse gas emissions as accurately as possible, including by taking global damages into account." 86 Fed. Reg. at 7040. To accomplish this, EO13990 resurrects the Obama-era IWG and directs the IWG to "publish an interim SCC, SCN, and SCM within 30 days of the date of this order, which agencies *shall use* when monetizing the value of changes in greenhouse gas emissions resulting from regulations *and other relevant agency actions* until final values are published." *Id.* (emphasis added).

#### B. The Biden IWG Issues SC-GHG Estimates Effectively Identical to the Obama IWG's Discredited Estimates.

On February 26, 2021, the IWG released its SC-GHG Estimates. *See* ROA.2032 (Interagency Working Group on Social Cost of Greenhouse Gases, Technical Support Document: Social Cost of Carbon, Methane, and Nitrous Oxide, Interim Estimates Under Executive Order 13990 (Feb. 26, 2021)), bit.ly/3HUKUVr ("Biden SC-GHG Estimates"). The Biden SC-GHG Estimates are identical to those in the Obama

Administration's 2016 Technical Support Document and addendum, adjusted for inflation. But they depart radically from the Trump Administration's values. And the Biden IWG did not solicit or receive comments or any public input or peer review despite EO13990's directive to "solicit public comment; engage with the public and stakeholders; [and] seek the advice of ethics experts." 86 Fed. Reg. at 7041.

The Biden IWG itself recognizes the inherent uncertainty surrounding the SC-GHG Estimates and acknowledges that it is engaged in an inherently legislative function. *See* ROA.3160 (noting it was balancing "affected interests" such as "net agricultural productivity, human health effects, property damage from increased flood risk natural disasters, disruption of energy systems, risk of conflict, environmental migration, and the value of ecosystem services"). The Biden SC-GHG Estimates' two most radical breaks from past regulatory practice are the same as the Obama IWG's: (1) the focus on global rather than domestic effects, and (2) the rejection of the longstanding 7 percent discount rate.

The Biden Administration used the SC-GHG Estimates across the board in its agency activities from their promulgation in February 2021 until the district court's injunction in February 2022. Indeed, in a Federal

Register notice filed in March, the Administration stated that it *continued to* employ the SC-GHG Estimates *even after* it was enjoined from doing so. *See* Dep't of Energy, Proposed Rule, *Energy Conservation Program: Energy Conservation Standards for Variable Refrigerant Flow Multi-Split Air Conditioners and Heat Pumps*, 87 Fed. Reg. 11335, 11348 (Mar. 1, 2022).[1]

## IV. THE STATES OBTAIN INJUNCTIVE RELIEF.

After the IWG promulgated the immediately binding SC-GHG Estimates, a coalition of States challenged the Executive Order and Estimates. After briefing, reviewing a substantial body of unrebutted evidentiary submissions, conducting oral argument, and requesting supplemental briefing, the district court issued a preliminary injunction on February 11, 2022. Doc. 99. The court first determined that it had jurisdiction to adjudicate Plaintiff States' challenge to EO13990 and to the Estimates. Doc. 98 at 11-27. The court then held that EO13990 and

---

[1] After Plaintiff States alerted the government to their apparent disregard for the court's order in their stay opposition below, Doc. 110, DOE issued a "Notice of Clarification" declaring that DOE is "adhering to the prohibitions in the preliminary injunction." Energy Conservation Program: Energy Conservation Standards for Variable Refrigerant Flow Multi-Split Air Conditioners and Heat Pumps; Clarification (Mar. 9, 2022), perma.cc/DPE5-VVKJ.

the Estimates likely exceeded the Executive Branch's authority because they are not authorized by any statement of congressional authority. *Id.* at 29-34. The Estimates are likely unlawful under the APA, the court held, because they were not promulgated after notice-and-comment procedures, are arbitrary and capricious, and violated several statutory provisions. *Id.* at 34-38.

The court next found that EO13990 and the Estimates irreparably harm Plaintiff States by reducing their tax revenues, harming their citizens' economic welfare, imposing additional duties on the States and State agencies in cooperative federalism programs, and divesting the States' procedural rights under the APA. *Id.* at 40-43. Finally, the court determined that the balance of harms and public interest "weigh heavily in favor of granting a preliminary injunction." *Id.* at 44.

On February 19, Appellants moved the district court to stay its preliminary injunction, or, alternatively, to stay the injunction "to the extent it goes beyond barring the treatment of the Working Group's analysis as mandatory or binding in agency actions." Doc. 103-1 at 3. The district court denied the stay motion on March 9. Doc. 111. After the district court denied the stay, the Government asked this Court to stay

the injunction, now complaining—despite arguing otherwise in district court for months—that the SC-GHG Estimates were in fact being used in *dozens* of federal actions and that federal government's operations would essentially come to a screeching halt if agencies could not *continue* using the Estimates. The motions panel accepted those arguments and stayed the injunction to allow the government's "continued use of" the SC-GHG Estimates.

According to the motions panel's order, the government was likely to succeed on appeal because Plaintiff States lacked standing—a conclusion flowing from the motion panel's view that the increased regulatory burden the SC-GHG Estimates will impose on the States "is, at this point, merely [a] hypothetical" "injury." That is, the States supposedly lack standing because the federal government *is not using* the SC-GHG Estimates. But at the same time, it thought the injunction preventing the Estimates' "continued use" must be stayed to prevent irreparable harm to the federal government. The motions panel never even mentioned the district court's findings about the current federal regulatory actions using the Estimates or the hundreds of billions of dollars in regulatory costs they will impose on States and other persons.

## SUMMARY OF ARGUMENT

The district court had jurisdiction over Plaintiff States' claims. As to standing, the Executive Order and Estimates (1) directly limit oil leasing and thereby reduce Plaintiff States' statutorily vested rights to oil-leasing revenues, Doc. 98 at 20; (2) are being employed to disapprove of state air-quality plans and thereby impose federal plans onto the States, *id.* at 22; and (3) inflict a procedural injury on the States, who are entitled to special solicitude in this administrative-procedure context, *id.* at 43-44.

As to ripeness, the case is fit for review because it raises purely legal questions, does not depend on further factual analysis, and involves final agency action. *Texas v. United States*, 497 F.3d 491, 498-99 (5th Cir. 2007). The actions at issue here involve a formal and final (albeit unlawful) rulemaking process that altered the legal regime and bound the agencies. Plaintiff States will suffer hardship absent review because Appellants are employing the Estimates today to decrease Plaintiff States' revenues, disapprove their proposals, and increase their regulatory burdens. *See id.* at 499.

Contrary to Appellants' claims, Plaintiff States had both an APA cause of action and a traditional *ultra vires* cause of action. The IWG is

an agency for APA purposes because it has substantial independent authority to impose Estimates that bind executive agencies. *Soucie v. David*, 448 F.2d 1067, 1073 (D.C. Cir 1971). And the Estimates are final agency actions because they were the final step necessary to bind those agencies and carry a new legal regime into effect. *State of Fla. v. Weinberger*, 492 F.2d 488, 492 (5th Cir. 1974).

On the merits, there were multiple independently valid grounds for the preliminary injunction. The Executive Order and Estimates are unlawful because no statute authorizes such a fundamental transformation of the entire Executive Branch's conduct (or the economy). They also run into conflict with several express statutory provisions, including 42 U.S.C. §6295(o)(2)(B)(i) and §7401(b)(1)'s requirements that agencies focus on domestic rather than global costs of energy standards, and the Mineral Leasing Act's mandates to promote the orderly development of all oil-and-gas deposits and obtain for the public reasonable financial returns on oil-and-gas deposits.

The Executive Order and the Estimates unlawfully bypassed notice and comment because they create a new and binding legal regime governing a wide range of administrative activity. *United States v.*

*Riccardi*, 989 F.3d 476, 487 (6th Cir. 2021). Their failure to provide for notice and comment was not harmless given the significant new data and insights from recent years that Plaintiff States could have presented during that process. *Sierra Club v. U.S. Fish & Wildlife Serv.*, 245 F.3d 434, 444 (5th Cir. 2001). And the Estimates are arbitrary and capricious because they cast aside reliance interests. *See, e.g.*, *Texas v. Biden*, 20 F. 4th 928, 989 (5th Cir. 2021) (failure to consider reliance "alone is fatal").

Finally, the equitable factors support the preliminary injunction because the States cannot recoup their economic losses through an ordinary damages action, *Texas v. Biden*, 20 F.4th 928, 975 (5th Cir. 2021); the States' sovereign interests are paramount, *Texas v. EEOC*, 933 F.3d 433, 446-47 (5th Cir. 2019); and the public interest lies in ensuring that the Executive Branch not enact an all-encompassing, unauthorized environmental agenda by unchecked decree.

## STANDARD OF REVIEW

This Court "review[s] a preliminary injunction for abuse of discretion, reviewing findings of fact for clear error and conclusions of law de novo." *Texans for Free Enter. v. Texas Ethics Comm'n*, 732 F.3d 535, 537 (5th Cir. 2013). "Under the clearly erroneous standard, th[e] court upholds findings by the district court that are plausible in light of the

record as a whole." *Moore v. Brown*, 868 F.3d 398, 403 (5th Cir. 2017).

"[A]n appellate court may not reverse" district court fact findings "even if it is convinced that it would have weighed the evidence differently in the first instance." *Texas v. Biden*, 20 F.4th at 966.

## ARGUMENT

### I. THE DISTRICT COURT HAD JURISDICTION.

#### A. Plaintiff States Have Standing.

Appellants assert (at 23-35) that Plaintiff States lack standing because the Executive Order and Estimates could be challenged on an action-by-action or sale-by-sale basis later down the road. This argument is a throwback to the days of "prudential" standing, when courts considered functionalist arguments about how a claim ought to proceed, rather than simply asking whether a valid Article-III injury existed. *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 126 (2014). Appellants thereby elide the fundamental question whether the Executive Order and Estimates injure the Plaintiff States. Because the answer to that question is yes, the Plaintiff States have standing.

First, the Estimates "increase the cost estimates of [oil-and-gas] lease sales," which naturally "reduces the number of parcels being leased, resulting in the States receiving less in bonus bids, ground rents, and

production royalties." Doc. 98 at 20. The Administration's use of the Estimates in NEPA reviews "directly causes harm to the Plaintiff States' statutorily vested rights to proceeds from [] oil and gas leases." *Id.* A State's "loss of even a small amount of money is ordinarily an injury" for Article III standing purposes, so these revenue losses suffice. *Texas v. Biden*, 20 F.4th at 975.

Second, the federal government is using—and coercing the States to use—the Estimates right now in cooperative-federalism programs and is employing them to disapprove state air-quality implementation plans. Doc. 98 at 22. "[B]eing pressured to change state law constitutes an injury" because it implicates the State's "sovereign interest." *Texas v. EEOC*, 933 F.3d at 446-47 (5th Cir. 2019). The Estimates have put the Plaintiff States to "a forced choice: either they employ the Estimates in developing their state implementation plan, or the EPA subjects them to a federal plan based on the SC-GHG Estimates." Doc. 98 at 20. Executive agencies have "already employed the SC-GHG Estimates, such as the EPA in disapproving state implementation plans under the NAAQS good neighbor provisions and imposing federal implementation plans on several Plaintiff States including Louisiana, Kentucky, and Texas." *Id.*

at 20. This alone constitutes an injury in fact. *See*, *e.g.*, *Toilet Goods Ass'n v. Gardner*, 360 F.2d 677, 685-86 (2d Cir. 1966) (Friendly, J.), *aff'd sub nom.* 387 U.S. 158 (1967), *and aff'd*, 387 U.S. 167 (1967); *see also Texas v. United States*, 524 F. Supp. 3d 598, 630 (S.D. Tex. 2021) (the "pressure exerted on Texas to reconfigure its budget" suffices for standing).

Third, the States suffered a procedural injury. "[T]he implementation of SC-GHG Estimates without complying with the APA and the notice and comment period have divested Plaintiff States of their procedural rights." Doc. 98 at 43-44. The deprivation of Plaintiff States' procedural right is not an injury "*in vacuo*." *Summers v. Earth Island Inst.*, 555 U.S. 488, 496 (2009). Contrary to Appellants' assertion (at 34-35), the lack of notice and comment harmed numerous concrete State interests—in oil-and-gas lease-sale revenues, Doc. 98 at 18-19, in increased regulatory burdens, *id.* at 13-15, and in cooperative federalism, *id.* at 12-13.[2]

---

[2] Appellants rely (at 33 n.6) on *El Paso County v. Trump*, but that case actually aids Plaintiff States, who have identified numerous sources of specific revenue to which they are entitled that will be harmed by the Estimates—including Kentucky's coal severance-tax revenues and MLA oil-and-gas leasing revenues. *See* Doc. 46-2 at 19-20 (collecting examples). As the district court found, Doc. 98 at 13, 19 n.46, 20-21, 26, 37, 41, 43, Plaintiff States easily satisfied their burden of identifying "specific tax

The States are entitled to two additional layers of deference in this inquiry. First, the district court's extensive jurisdictional findings—each of which is supported by citations to the record—are assumed correct unless this Court finds "clear error." *DeJoria v. Maghreb Petroleum Expl., S.A.*, 935 F.3d 381, 390 (5th Cir. 2019). And second, the States are "entitled to special solicitude." *See, e.g.*, *Texas v. Biden*, 20 F.4th at 969 (cleaned up). "[T]he states [] 'are not normal litigants for the purposes of invoking federal jurisdiction.'" *Texas v. United States*, 809 F.3d 134, 152-53 (5th Cir. 2015). Rather, they are entitled to special solicitude here since "'[t]he parties' dispute turns on the proper construction of a congressional statute, the APA," and the challenged action "affects the states' quasi-sovereign interests by imposing substantial pressure on them to change their" practices and laws to remain in compliance with federal standards. *Id.* So just as "Massachusetts, armed with special solicitude," could "establish causation between the EPA's decision to not regulate greenhouse gas emissions from new motor vehicles and its interest in protecting its physical territory," *Texas*, 524 F. Supp. 3d at

---

revenues" directly harmed by the Estimates, *El Paso Cty., Texas v. Trump*, 982 F.3d 332, 340 (5th Cir. 2020).

630, Plaintiff States are "entitled to the same special solicitude as was Massachusetts," *Texas*, 809 F.3d at 159. And "the causal link" between the Estimates and Plaintiffs' sovereign interest, budgets, procedural rights, and citizens' economic wellbeing "is even closer here." *Id.*

Despite Appellants' insistence to the contrary, the federal government is using the Estimates right now in agency actions across the Executive Branch, ranging from NEPA review to rulemaking. *See* Doc. 98 at 18 (citing DOI order applying the Estimates to Interior Department decisionmaking, which includes oil-and-gas leasing), *id.* at 19 (citing DOT NEPA analysis using the Estimates); *see also id.* at 15-20, 31 (documenting use of the Estimates across the government). There is thus nothing speculative about the chain of causation that has injured and will continue to injure the States.

**B.    Plaintiff States' Claims Are Ripe.**

Appellants assert (at 35-40) that this case is not ripe because some plaintiff at some future point might bring a future challenge to future regulatory actions based on the Estimates. That misapprehends the ripeness inquiry. This Court has been clear on the proper standard: "To determine if a case is ripe for adjudication, a court must evaluate (1) the

fitness of the issues for judicial decision, and (2) the hardship to the parties of withholding court consideration." *Texas v. United States*, 497 F.3d at 498 (5th Cir. 2007). Both elements are met here.

*First*, this case is fit for review. "A challenge to administrative regulations is fit for review if (1) the questions presented are 'purely legal one[s],' (2) the challenged regulations constitute 'final agency action,' and (3) further factual development would not 'significantly advance [the court's] ability to deal with the legal issues presented.'" *Id.* at 498-99. Appellants do not contest that Plaintiff States' APA and *ultra vires* claims are purely legal. And as Plaintiff States explain below, the Estimates constitute final agency action. *See State of Fla. v. Weinberger*, 492 F.2d 488, 492 (5th Cir. 1974) (case ripe because challenged "regulation is final and is formally and actually in effect").

Because these are purely legal questions, factual development would not aid the Court in determining whether the Estimates violate the APA or whether the Executive Order exceeds the President's lawful authority. *See, e.g.*, *Nevada v. United States Dep't of Lab.*, 275 F. Supp. 3d 795, 801 (E.D. Tex. 2017) (case ripe to determine whether "the Final Rule is lawful, whether the Department has authority to promulgate the

Final Rule, and whether [agency actin] complies with the ... APA"); *see also Venetian Casino Resort, L.L.C. v. E.E.O.C.*, 409 F.3d 359, 364-65 (D.C. Cir. 2005) ("Resolution of this question turns on an analysis of the pertinent statutes and their construction by relevant case law. There is nothing to be gained by deferring such considerations."); *cf. Texas v. United States*, 201 F. Supp. 3d 810, 824 (N.D. Tex. 2016) (case ripe because "[t]he only other factual development that may occur, given Appellants' conclusion Plaintiffs are not in legal compliance, is whether Appellants actually seek to take action against Plaintiffs"). That makes this case fit for review.

Appellants' counterarguments were rejected by this Court in *Texas v. United States*, where the Government argued "with regard to the remaining fitness principles" that "Texas's alleged injury is the speculative harm that could result if the Secretary were *ultimately* to approve gaming procedures." 497 F.3d at 499 (emphasis added). "[T]his is incorrect," this Court explained, because "Texas claims present injury from submission to an invalid agency process, regardless whether the Secretary ultimately allows gaming." *Id.* Like the plaintiffs there, Plaintiff States here challenge a flawed and unlawful process—one that

led to the SC-GHG Estimates. "With this distinction in mind, [Plaintiff States'] claims are fit for adjudication" and "[a]dditional fact-finding would not aid [the Court's] inquiry into the purely legal question of [the Executive Order and Estimates'] validity." *Id.*

*Second*, Plaintiff States will suffer hardship absent immediate review. As an initial matter, "[t]he hardship prong of the ripeness doctrine 'is largely irrelevant in cases, such as this one, in which neither the agency nor the court have a significant interest in postponing review.'" *Venetian Casino Resort*, 409 F.3d at 365-66. Appellants identify no significant interest in postponing review here because there is none. Delay will only bog Plaintiff States down in years of litigation while the Executive employs the illegal Estimates in accordance with the illegal Executive Order.

In any event, "[t]he Supreme Court has found hardship to inhere in legal harms, such as the harmful creation of legal rights or obligations; practical harms on the interests advanced by the party seeking relief; and the harm of being 'force[d] ... to modify [one's] behavior in order to avoid future adverse consequences.'" *Texas*, 497 F.3d at 499 (citing *Ohio Forestry Ass'n*, 523 U.S. 726, 734 (1998)). As Plaintiff States explained at

length above, the SC-GHG Estimates and Executive Order do all three. And in the ripeness context, this Court has found harms identical to the States' asserted harms to justify immediate review. *See, e.g.*, *id.* ("If Texas cannot challenge the Procedures in this lawsuit, the State is forced to choose one of two undesirable options: participate in an allegedly invalid process that eliminates a procedural safeguard promised by Congress, or eschew the process with the hope of invalidating it in the future, which risks the approval of gaming procedures in which the state had no input."); *Weinberger*, 492 F.2d at 492 ("As for that hardship, the state is presently faced with the dilemma whether to bow to the Secretary's volte-face and amend its laws and procedures, with all the likely financial outlay and certain legislative and administrative effort which that process entails.").

All of this is consistent with the general rule that executive actions that bind agencies to a certain course are immediately reviewable. For example, in *Lujan v. National Wildlife Federation*, the Court noted that an agency action "applying some particular measure across the board to all individual classification terminations and withdrawal revocations" would be reviewable "at once" if "as a practical matter [it] requires the

plaintiff to adjust his conduct immediately." 497 U.S. 871, 890 n.2, 891 (1990). In that same vein, when across-the-board actions "pre-determine[] the future through the selection of a long-term plan (to the exclusion of others which will not be among the available options at the implementation phase)," they are "ripe for review." *Laub v. U.S. Dep't of Interior*, 342 F.3d 1080, 1091 (9th Cir. 2003); *accord Texas*, 933 F.3d at 444 ("Although the order 'had no authority except to give notice of how the Commission interpreted' the relevant statute, and 'would have effect only if and when a particular action was brought against a particular carrier,' [the Supreme Court] held that the order was ... immediately reviewable.'"); *Weinberger*, 492 F.2d at 492 ("[T]here is no need for Florida to stand by while the Secretary ticks, hoping that he will not go off."); *Strata Prod. Co. v. Jewell*, 2014 WL 12789010, at *9 (D.N.M. Aug. 11, 2014) ("Although the BLM may issue APDs and prepare additional environmental analyses in the context of specific APDs, those more specific actions do not mean that the promulgation of the more general policies set forth in the 2012 Order does not also constitute a final agency action.").

By imposing a new binding regime on agency decisionmaking, the SC-GHG Estimates predetermine the factors agencies will rely on, making it futile for Plaintiff States to challenge those factors in the rulemaking process.[3] That's why the States cannot simply "wait" until the Estimates are employed in a future rulemaking. The President has directly ordered his agencies to employ the Estimates—and they've done so (and are doing so). The Estimates thus alter the legal regime by dictating the outcome of the cost/benefit analysis. Indeed, the Estimates have "virtually determinative effect[s]" on subsequent rulemakings. *Bennett v. Spear*, 520 U.S. 154, 170 (1997). What's more, agencies are not "technically free to disregard" an executive order. *Id.* Because the Estimates "pre-determine[] the future through the selection of a long-term plan (to the exclusion of others which will not be among the

---

[3] This factor distinguishes *Zero Zone v. Department of Energy*, 832 F.3d 654, 677 (7th Cir. 2016), and the FERC cases that Appellants cite. *Zero Zone* involved the Obama Administration's technical support document, which was not imposed upon agencies by an executive order, *see* GAO, *Regulatory Impact Analysis: Development of Social Cost of Carbon Estimates* (July 2014). And FERC is an independent agency that is not bound by EO13990. *See* Doc. 48 at 38-39.

available options at the implementation phase)," they are "ripe for review." *Laub*, 342 F.3d at 1091; *see also Texas*, 933 F.3d at 444.[4]

Appellants resist that conclusion primarily by misreading *Ohio Forestry Ass'n, Inc. v. Sierra Club*, 523 U.S. 726 (1998), and *Nat'l Park Hospitality Ass'n v. Dep't of the Interior*, 538 U.S. 803 (2003), to stand for the proposition that any time a regulatory action can also be challenged in a later proceeding, it is not ripe for review when it is promulgated. On this reading, all this Court's ripeness precedents defied Supreme Court precedent all along. Fortunately, they do not. *Ohio Forestry Association* involved a nonbinding forest plan subject to "future actions to revise … or modify the expected methods of implementation." 523 U.S. at 727. The Court held that the plaintiff's challenge to the plan was not ripe because the plan did not "inflict significant practical harm" upon the plaintiff and

---

[4] Respondents' reliance on EO13990's "in a manner consistent with applicable law" clause fails. Boilerplate savings clauses cannot override an Executive Order's commands that are mandatory and unlawful. *See Hias, Inc. v. Trump*, 985 F.3d 309, 325 (4th Cir. 2021); *City & Cty. of San City & Cty. of San Francisco v. Trump*, 897 F.3d 1225, 1240 (9th Cir. 2018). And even assuming that the savings clause is operative, the Executive Order would still preclude the States from challenging individual agency actions on arbitrary-and-capricious grounds because agencies could point to the Executive Order as a justification for ignoring contrary comments.

did not "force it to modify its behavior in order to avoid future adverse consequences," *id.*—the opposite of what Plaintiff States have demonstrated here.

Similarly, *National Park Hospitality Association* involved "nothing more than a 'general statemen[t] of policy' designed to inform the public of" the agency's views. 538 U.S. at 809. The Court specifically found that plaintiffs suffered "no practical harm" from the policy statement, *id.* at 810—again the opposite of Plaintiff States' detailed showing (and the district court's detailed findings) of legal and practical harm here.

In sum, this is Plaintiff States' only adequate opportunity to challenge the Executive Order itself and 2021 SC-GHG Estimates themselves. Plaintiff States need not suffer ongoing and irreparable injury just to try to raise the same arguments against the same final action in a future case. "[T]he lines are drawn, the positions are taken and the matter is ripe for judicial review." *State of La. v. Dep't of Energy*, 507 F. Supp. 1365, 1372 (W.D. La. 1981), *aff'd sub nom.* 690 F.2d 180 (Temp. Emer. Ct. App. 1982).

## II. THE DISTRICT COURT'S PRELIMINARY INJUNCTION WAS LAWFUL.

### A. Plaintiff States Have Multiple Causes of Action.

Appellants try (at 41-46) to rebut the Plaintiff States' causes of action. In so doing, they make four mistakes.

*First*, the States' suit is not an amorphous programmatic challenge like the ones cited by Appellants. This lawsuit does not ask the courts to dictate policy. Rather, it seeks to enjoin a discrete action—the Estimates—that dictates specific numerical figures to be used in all agency cost/benefit analysis. Unlike the challengers in *Lujan v. National Wildlife Federation*, 497 U.S. 871 (1990), and *Alabama-Coushatta Tribe of Texas v. United States*, 757 F.3d 484 (5th Cir. 2014), Plaintiff States do not seek to enlist the Court in an ongoing supervision of the Department's administration of a program. This suit is a far cry from the "blanket challenge" to *all* actions at issue in *Alabama-Coushatta*, 757 F.3d at 490, or the attempt in *Lujan* to obtain better management of BLM's land-withdrawal review program, 497 U.S. at 891. Indeed, *Lujan* specifically explained that a specific action "applying some particular measure across the board" *would* constitute final agency action. 497 U.S. 871, 890 n.2 (1990); *see also W. Energy All. v. Jewell*, 2017 WL 3600740, at *13 (D.N.M. Jan. 13, 2017).

*Second*, contrary to Appellants' arguments, the IWG is an "agency" for purposes of the APA because it has been granted authority by EO13990 to act "with substantial independent authority in the exercise of specific functions." *Soucie*, 448 F.2d at 1073. The IWG has substantial authority that is independent from the President himself. EO13990 vests the IWG with significant independent authority to create SC-GHG Estimates that bind executive agencies. *See* EO13990 §5(b)(ii)(A). No further action from the President is needed. This power to "issue guidelines to federal agencies for the preparation of" regulatory review is a hallmark of an APA agency. *Pac. Legal Found. v. Council on Envtl. Quality*, 636 F.2d 1259, 1262 (D.C.Cir.1980). Beyond that, the IWG is tasked with ongoing and independent research and investigative functions, another hallmark of agency status. EO13990, §5(b)(ii)(C)-(E), (b)(iii); *Meyer v. Bush*, 981 F.2d 1288, 1292 (D.C. Cir. 1993) ("By virtue of its independent function of evaluating federal programs, the OST must be regarded as an agency."); *see Rushforth v. Council of Econ. Advisers*, 762 F.2d 1038, 1041 (D.C. Cir. 1985) ("initiation and support of research, awarding scholarships, fostering the interchange of information and

evaluating the status of the sciences in correlating the research" are hallmarks of an agency).

Appellants' contention (at 43-44) that the IWG exists solely to assist the President thus misstates the facts. Unlike the Task Force at issue in *Meyer*, the IWG can take significant unilateral actions, including promulgating final rules that bind executive branch agencies. *Compare Meyer*, 981 F.2d at 1294, *with CREW v. Office of Admin.*, 566 F.3d 219, 233 (D.C. Cir. 2009) (observing that the Task Force "lacked substantial authority independent of the President 'to direct executive branch officials'"). Indeed, *Meyer*'s holding was based upon the Task Force's lack of "substantial independence" from the President—the court specifically found that it was reliant directly upon the President for all its functions. And unlike the IWG, the Task Force did not have the independent authority to bind executive agencies, but instead "found it necessary to advise the President to put such instructions in another Executive Order." *Meyer*, 981 F.2d at 1294.

Concluding that an entity with independent authority to promulgate a historically consequential rule governing the entire Executive Branch is *not* an agency subject to judicial review defies

common sense. *See Rushforth*, 762 F.2d at 1041 (noting irrelevance of lack of grant of statutory authority to agency status and that "it was the functional role of the agency on which *Soucie* turned"). Finally, the IWG's lack of a statutory grant of authority makes judicial review more essential, not less. *Cf. BNSF Ry. Co. v. EEOC*, 385 F.Supp.3d 512, 523 (N.D. Tex. 2018). "[W]hen an agency 'engage[s] in shenanigans by exceeding its statutory bounds, judicial review remains available consistent with the Administrative Procedure Act, which directs courts to set aside agency action not in accordance with law or in excess of statutory jurisdiction, authority, or limitations.'").

*Third*, Appellants' assertion (at 44-46) that the Estimates are not final agency action is implausible now given Appellants' admission that the Estimates are in use across the Executive Branch and that the injunction significantly undermines Executive Branch decisionmaking. That can be true only if the Estimates are final and have binding legal effects. At a minimum, the Estimates are final agency action because (1) they represent the consummation of the Executive's decisionmaking process and (2) they have binding legal effects. The Estimates are "final agency action under the principle that, 'where agency action withdraws

an entity's previously-held discretion, that action alters the legal regime, binds the entity, and thus qualifies as final agency action' under the APA." *Texas v. Biden*, 20 F.4th at 948.

*Fourth*, Appellants' brief effort (at 53-54) to rebuff the *ultra vires* cause of action is easily answered by the long line of cases holding that "[u]ltra vires review is available to review 'whether the President has violated the Constitution, the statute under which the challenged action was taken, or other statutes, or did not have statutory authority to take a particular action.'" Doc. 98 at 39-40 (collecting cases).

Contrary to Appellants' contention (at 53-54) that Plaintiff States are attempting to circumvent APA review, Plaintiff States' *ultra vires* cause of action is precisely the type that courts have long recognized. *Ultra vires* review is available to determine "whether the President has violated the Constitution, the statute under which the challenged action was taken, or other statutes, or did not have statutory authority to take a particular action." *Ancient Coin Collectors Guild v. U.S. Customs & Border Prot.*, 801 F. Supp. 2d 383, 406 (D. Md. 2011) (citing *Mountain States Legal Found. v. Bush*, 306 F.3d 1132, 1136 (D.C. Cir. 2002)); *see Associated Builders & Contractors of Se. Tex. v. Rung*, 2016 WL 8188655,

at *5 (E.D. Tex. Oct. 24, 2016) ("The DOL, a federal agency also operating within the Executive Branch, has implemented the President's Executive Order by issuing the Guidance incorporated by reference in the new Rule. Therefore, the Executive Order may be challenged by Plaintiffs on both statutory and non-statutory grounds.") (citing *Chamber of Com. v. Reich*, 74 F.3d 1322, 1332 (D.C. Cir. 1996)).

So if *ultra vires* review is an extraordinary remedy, it is a commensurate response when the Executive takes extraordinary acts beyond legal authority, and courts have never shrunk from their duty to rein in lawless action. It is not Plaintiff States who seek an end-run round the APA—it is the President, who has created an agency out of whole cloth to promulgate a legislative rule of historical importance without statutory authority.

The President's directive to impose a uniform social cost of greenhouse gases across the government—especially through EO13990's explicit command to "tak[e] global damages into account"—is not authorized by any statute and is in direct conflict with several statutes. Such *ultra vires* presidential action is subject to judicial review— particularly when it concerns matters of major national importance. *See*

*Rosebud Sioux Tribe v. Trump*, 428 F. Supp. 3d 282, 291 (D. Mont. 2019)

("A court's power to enjoin the President extends to enjoining portions of an executive order where the order 'exceeds the statutory authority delegated by Congress and constitutional boundaries.'").[5] The EO's boilerplate "consistent with law" language does not save its mandatorily worded unlawful commands from judicial review. EO13990 §5(b)(ii)(A); *Louisiana,* 543 F.Supp.3d at 415; *Hias, Inc. v. Trump*, 985 F.3d 309, 325 (4th Cir. 2021); *San Francisco*, 897 F.3d at 1239.

## B. The Executive Order and Estimates Are Unlawful for Several Independently Sufficient Reasons.

Appellants fail to engage with the district court's numerous independently sufficient holdings about the unlawfulness of the Executive Order and SC-GHG Estimates.

---

[5] *See also San Francisco*, 897 F.3d at 1239-40; *Mountain States Legal Found.*, 306 F.3d at 1136 (D.C. Cir. 2002); *League of Conservation Voters v. Trump*, 303 F. Supp. 3d 985, 995 (D. Alaska 2018); *Ancient Coin Collectors Guild*, 801 F. Supp. 2d at 406; *Associated Builders & Contractors of Se. Texas*, 2016 WL 8188655, at *5; *W. Watersheds Project v. Bureau of Land Mgmt.*, 629 F. Supp. 2d 951, 960 (D. Ariz. 2009); *City of Dallas, Tex. v. Hall*, 2007 WL 3257188, at *15 (N.D. Tex. Oct. 29, 2007).

### 1. The Estimates Are Unauthorized and Contravene Several Statutes.

Appellants attack (at 47-49) the district court's reliance on the Major Questions Doctrine by again suggesting that the Order and Estimates are routine exercises of Executive supervision over rulemaking. Not true. These actions undermine decades of bipartisan regulatory review practice by placing a weight so heavy on EO12866's neutral cost/benefit scale that it collapses. Unlike the *process* established by EO12866, EO13990 and the Estimates dictate a *specific binding rule* to the agencies that predetermine nearly all outcomes by mandating massive numbers for the cost side of the scale. *See* Doc. 91 at 22-23.

Thus, far from being a mere process, "EO 13990 and the SC-GHG Estimates are a legislative rule that dictates specific numerical values for use across all decisionmaking affecting private parties." Doc. 98 at 33 (citing *Catholic Health Initiatives v. Sebelius*, 617 F.3d 490, 495 (D.C. Cir. 2010)). And Appellants cannot simultaneously claim that the EO13990 and SC-GHG Estimates do not work "on a dramatic scale" and then later contend precisely the opposite to establish irreparable harm.

Given the Estimates' transformative effect on the economy, infringement on the legislative power, and usurpation of traditional

State powers, the burden is on the Executive Branch to identify clear congressional authorization for them. *Nat'l Fed'n of Indep. Bus. v. Dep't of Lab.*, 142 S. Ct. 661, 665 (2022). Despite having numerous chances, Appellants still have not pointed to even *one sentence* in the United States Code authorizing the Executive Order and Estimates. Doc. 98 at 29-34 (collecting cases).

Making matters worse, when Congress does address whether a national or global frame of reference is appropriate, it has decisively come down on the side of considering only national effects. *First*, take the Energy Policy and Conservation Act, which allows DOE to create energy-efficiency standards with an eye toward only domestic costs. 42 U.S.C. §6295(o)(2)(B)(i). Despite that limit, the Executive Order directs IWG to "tak[e] global damages into account." ROA.2028. EPCA's structure also reveals the statute's domestic focus—CAFE standards must be promulgated considering "the need of *the United States* to conserve energy." 49 U.S.C. §32902(f) (emphasis added). Nowhere is the Secretary authorized to eschew such domestic considerations in favor of the global effects mandated by EO13990 and the SC-GHG Estimates.

*Second,* Congress specified in the Clean Air Act that regulations must "protect and enhance the quality of *the Nation's* air resources to promote the public health and welfare and the productive capacity of its population." 42 U.S.C. §7401(b)(1) (emphasis added). Additionally, and like EPCA, when Congress intended the agency to consider global effects, it granted specific and limited authority to do so. *See id.* §17352(a)(3); *id.* §7415(a). The Executive Order's across-the-board directive to consider global effects cannot be reconciled with these careful statutory regimes. *See Corrosion Proof Fittings v. EPA*, 947 F.2d 1201, 1209 (5th Cir. 1991) (international considerations cannot be implied when statute "provides a laundry list of factors to consider when promulgating a rule under section 6, including 'the effect [of the rule] on the national economy'" and "[i]nternational concerns are conspicuously absent from the statute").

*Third*, the Biden SC-GHG Estimates contravene the Mineral Leasing Act, which directs the Secretary of the Interior to "'promote the orderly development of oil and gas deposits in publicly owned lands of the United States through private enterprise,'" "'obtain for the public reasonable financial returns on assets belonging to the public,'" *Wyoming*, 493 F. Supp. 3d at 1062, and "provide incentives to explore

new, unproven oil and gas areas through noncompetitive leasing," *Arkla Expl. Co. v. Tex. Oil & Gas Corp.*, 734 F.2d 347, 358 (8th Cir. 1984).

The Biden SC-GHG Estimates will lead to fewer lease sales and permit approvals, undermining the MLA's statutory framework. And the SC-GHG Estimates require BLM to contravene the MLA by relying upon global costs rather than national costs. *See Wyoming*, 493 F. Supp. 3d at 1078 ("[T]he Court questions whether the 'social cost of methane'— particularly on a global scale—is a factor Congress intended BLM to consider in promulgating a resource conservation rule pursuant to its MLA authority. It seems an unreasonable stretch to interpret BLM's authority under the MLA to require lease provisions 'for the safeguarding of the public welfare' (30 U.S.C. § 187) as congressional intent that the BLM consider this ancillary air quality benefit.").

*Fourth*, the Biden SC-GHG Estimates contravene OCSLA by compelling a global-effects analysis. OCSLA's text concerns only "the local environmental impact of leasing activities in the OCS and does not authorize—much less require—Interior to consider the environmental impact of post-exploration activities such as consuming fossil fuels on either the world at large, or the derivative impact of global fossil fuel

consumption on OCS areas." *Ctr. For Biological Diversity*, 563 F.3d at 485. Accordingly, "Interior simply lacks the discretion to consider any global effects that oil and gas consumption may bring about." *Id.*

### 2. The Estimates Did Not Receive Notice and Comment.

Appellants contend (at 50-51) that the Estimates are not legislative rules requiring notice-and-comment procedures because they do not directly regulate private conduct. But the question is not whether the Estimates regulate private conduct—which they do by imposing obligations on State agencies—but whether they have binding legal effect. *See United States v. Riccardi*, 989 F.3d 476, 487 (6th Cir. 2021) ("Precedent ... recognizes that a specific numeric amount ... generally will not qualify as a mere 'interpretation' of general nonnumeric language." (collecting cases)).

Appellants cannot invoke the harmless-error rule to shield a historically important regulatory action from public comment. *Sierra Club*, 245 F.3d at 444 ("Agency mistakes constitute harmless error only where they 'clearly had no bearing on the procedure used or the substance of decision reached.' This Court has affirmed that '[a]bsence of such prejudice must be clear for harmless error to be applicable.'"). The

Executive's error was not harmless because the 2021 Estimates have never been subject to public comment, and never will be absent an order from this Court. Plaintiff States thus had no opportunity to raise four years of developments and new studies since the last comment period (to the extent a prior comment period existed) or the specific findings of agencies between 2017 and 2021 rejecting the IWG's methodology.

Plaintiff States also extensively allege that the previous iteration of the SCC Estimates never had adequate independent comment period. Neither the 2010–2017 Estimates nor their 2021 successors have complied with the APA's notice-and-comment requirement. *E.g.*, Doc. No. 1 at 20-22, ¶¶59-63; *id.* at 24-25, ¶¶70-73; *id.* at 29, ¶85; *id.* at 32-34, ¶¶96-100; *id.* at 51, ¶¶137-141. Accordingly, Appellants cannot meet their heavy burden of showing harmless error. *United States v. Johnson*, 632 F.3d 912, 931 (5th Cir. 2011) ("An overreaching harmless error doctrine would allow the agency to inappropriately 'avoid the necessity of publishing a notice of a proposed rule and perhaps, most important, [the agency] would not be obliged to set forth a statement of the basis and purpose of the rule, which needs to take account of the major comments— and often is a major focus of judicial review.'").

### 3. The Estimates Are Arbitrary and Capricious.

Appellants' only argument (at 51-53) to try to show the Estimates' reasonableness is that this Court must accept the Administration's politicized explanation for the Estimates. But contrary to Appellants' plea for deference bordering on abdication, arbitrary-and-capricious review "under the APA is not toothless." *Sw. Elec. Power Co. v. EPA*, 920 F.3d 999, 1013 (5th Cir. 2019). Quite the contrary, "after *Regents*, it has serious bite." *Wages & White Lion Invs., LLC v. FDA*, 16 F.4th 1130, 1136 (5th Cir. 2021). And in making this assessment, this Court is "'not required to exhibit a naiveté from which ordinary citizens are free.'" *Dep't of Com. v. New York*, 139 S. Ct. 2551, 2575 (2019).

Though Appellants claim that the Estimates represent the best scientific evidence, they were rushed out in a month without public comment and without peer review. Indeed, Appellants take no account of years of developments. These facts confirm that the Estimates were imposed for political, not scientific, reasons. *Huawei Techs. USA, Inc. v. FCC*, 2 F.4th 421, 436 (5th Cir. 2021). Finally, Appellants do not even pretend global effects are within the factors that *any* statute allows an

agency to consider. *Nat'l Ass'n of Home Builders v. Defs. of Wildlife*, 551 U.S. 644, 658 (2007).

Perhaps most brazenly, Appellants make no attempt to defend the Administration's failure to consider reliance interests. Plaintiff States extensively detailed their reliance interests. *See* Doc. 63 at 20-21 (detailing Plaintiffs' reliance interests); Doc. 57 ¶¶18-26 (same). And, as the district court found, Plaintiff States were not even given the opportunity to provide the IWG with evidence of their reliance interests because *there was no comment period. See* Doc. 98 at 21 ("Plaintiff States have clearly established that ... [they] have been deprived of the right to submit comments which prevented Plaintiff States from raising important reliance interests and other flaws that directly affect the States."). The IWG's failure to consider the States' reliance upon the prior system is an independently sufficient reason to find the Estimates arbitrary and capricious. *See, e.g., Texas v. Biden*, 20 F. 4th at 989 (failure to consider reliance "alone is fatal").

## C.     The Equitable Factors Support an Injunction.

Plaintiff States face irreparable harm without an injunction. Appellants assert (at 54) that the Estimates do not require the States to

do anything. That is wrong. The Estimates immediately apply coercive pressure to the States to change their approach to greenhouse gas regulation. *See, e.g.*, Doc. 98 at 21 ("Plaintiff States have clearly established that … the SC-GHG Estimates create a new cost measure the Plaintiff States must use when running cooperative federalism programs or risk serious consequences."). This pressure, in itself, "constitutes an injury" to the States' "sovereign interests," whether or not States actually change their policies, *Texas v. EEOC*, 933 F.3d at 446-47 (cleaned up), and that continuing harm cannot be erased or remedied through after-the-fact relief, *see Texas v. Biden*, 20 F.4th at 975.

What's more, the harm to Plaintiff States' statutorily entitled oil-and-gas lease-sale revenues is irreparable. Appellants state that the Estimates are not affecting oil-and-gas lease sales or NEPA reviews. But this is false. As noted, BLM expressly justified withholding massive tracts of land from oil-and-gas leasing based on the motions panel's stay reinstituting the SC-GHG Estimates. DOI, BLM Utah 2022 First Competitive Oil and Gas Lease Sale, DOI-BLM-UT-0000-2021-0007-EA, at 18 (Apr. 18, 2022), bit.ly/38s9qlc. This withholding will deprive the States of vital statutory oil-and-gas lease revenues under the Mineral

Leasing Act. 30 U.S.C. §226. Similarly, since the motions panel's stay, DOE published a final Environmental Impact Statement that tries to justify a manufactured housing rule based on the Estimates. *See* Final Environmental Impact Statement for Proposed Energy Conservation Standards for Manufactured Housing, bit.ly/3wsqpvN (Apr. 2022).[6]

The remaining equitable factors overwhelmingly weigh against Appellants. The public interest and balance of harms weigh against a stay. Most obviously, Appellants "'have no legitimate interest in the implementation of [the] unlawful' SC-GHG Estimates." Doc. 98 at 44; *see also State v. Biden*, 10 F.4th 538, 559 (5th Cir. 2021) ("[T]he 'public interest [is] in having governmental agencies abide by the federal laws that govern their existence and operations.'"). And the "public interest favors maintenance of [an] injunction" that "maintains the separation of powers." *Texas v. United States*, 787 F.3d 733, 768 (5th Cir. 2015); *see also Biden*, 10 F.4th at 559. Finally, the injunction prevents major violations of the Tenth Amendment and "the public interest plainly lies

---

[6] And contrary to Appellants' assertion, these presently occurring damages cannot be remedied in the ordinary course of litigation. The federal government enjoys sovereign immunity. *See Texas v. United States*, 809 F.3d at 186.

in not allowing" Appellants "to circumvent those federalism concerns." *Biden*, 10 F.th at 559. Simply put, "[t]he public interest is also served by maintaining our constitutional structure ... even, or perhaps particularly, when those decisions frustrate government officials." *BST Holdings, L.L.C. v. Occupational Safety & Health Admin.*, 17 F.4th 604, 618-19 (5th Cir. 2021).

The irreparable harm Plaintiff States would suffer without an injunction puts the public interest and balance of harms beyond doubt. Any harm to Appellants' nonexistent interest in furthering an illegal policy is outweighed by Plaintiff States' irreparable harms.

## D. The Injunction Is Appropriately Tailored to Address Plaintiff States' Harms.

Appellants make much (at 59-62) of the scope of the district court's injunction. But at the preliminary injunction stage, if the Court finds the preliminary injunction factors are met, the ordinary remedy is to restrain Executive officers from complying with the agency action as if it were vacated. Vacatur is the ordinary and "'normal remedy' under the APA" for unlawful agency activity, *Am. Great Lakes Ports Ass'n v. Schultz*, 962 F.3d 510, 518 (D.C. Cir. 2020), and courts routinely enjoin the enforcement of agency action upon a preliminary finding that the agency

action is unlawful, *see, e.g.*, *Louisiana v. Biden*, 543 F. Supp. 3d 388, 419 (W.D. La. 2021). What Appellants really seem to want is a remand without vacatur in the preliminary-injunction posture, but Appellants are not entitled to that remedy because they do not expressly ask for it. *Cf. Am. Great Lakes Ports Ass'n*, 962 F.3d at 518.

Even if narrower relief were possible, Appellants have not demonstrated their entitlement to it. They premise all their arguments on a misrepresentation of the injunction as an affirmative injunction. That is not the case. The injunction prevents the Executive Branch from employing the Estimates. The natural result is that the still-in-force Circular A-4 will return as the governing standard and will once again cover climate-related cost/benefit analysis. With the Estimates enjoined, agencies will once again be subject to Circular A-4, which continues to embody the best regulatory practices.

Indeed, Appellants previously represented that *even in the presence of an injunction, agencies would continue to employ the Estimates*: "[W]hether or not the Interim Estimates are binding, agencies are not likely to ignore them, as they reflect years of cutting-edge work from leading experts and academics in and out of government." Doc. 31-1 at

24. Thus, taking Appellants at their own word, an injunction simply declaring the Estimates to be nonbinding is insufficient to prevent the harms caused by their use by agencies.

Even with the current injunction, there is still a need for vigilance because, as Appellants told the district court, "there are many reasons to expect that, given the policy priorities of the President and his Cabinet, agencies will still consider the social costs of greenhouse gases when regulating—even without any binding directive from the President, and even without being able to rely upon the work product of the Working Group." Doc. 31-1 at 24. Indeed, even since the injunction was entered, executive agencies continue to indicate that they will use the Estimates. *See* Dep't of Energy, Proposed Rule, *Energy Conservation Program: Energy Conservation Standards for Variable Refrigerant Flow Multi-Split Air Conditioners and Heat Pumps*, 87 Fed. Reg. 11335, 11348 (Mar. 1, 2022) ("DOE uses the social cost of greenhouse gases from the most recent update of the Interagency Working Group on Social Cost of Greenhouse Gases .... The IWG recommended global values be used for

regulatory analysis.").[7] Any relaxation of the injunction invites more defiance and irreparable harm to Plaintiff States.

## CONCLUSION

This Court should affirm the district court's preliminary injunction.

---

[7] DOE's subsequent notice, *supra* note 1, stating that it was not considering the Estimates in future rulemakings because of the injunction only highlights that the injunction is necessary to prevent further harm from the SC-GHG Estimates.

Respectfully submitted,

Dated: June 16, 2022

  /s/ Elizabeth B. Murrill

TYLER R. GREEN
JEFFREY S. HETZEL
CONSOVOY MCCARTHY PLLC
222 S. Main Street, 5th Floor
Salt Lake City, UT 84101
(703) 243-9423

STEVE MARSHALL
Attorney General of Alabama
Edmund G. LaCour Jr.
Solicitor General
Office of the Alabama Attorney
General
501 Washington Avenue
Montgomery, AL 36130
Tel: (334) 353-2196
Fax: (334) 353-8400
Edmund.LaCour@AlabamaAg.gov
*Counsel for the State of Alabama*

ASHLEY MOODY
Attorney General of Florida
Henry C. Whitaker
Solicitor General
Rachel Siegel
Deputy Solicitor General
Office of the Attorney General
The Capitol, PL-01
Tallahassee, FL 32399
Tel: (850) 414-3300
Fax: (850) 410-2672
henry.whitaker@myfloridalegal.com
rachel.siegel@myfloridalegal.com
*Counsel for the State of Florida*

JEFF LANDRY
  Attorney General
ELIZABETH B. MURRILL*
  Solicitor General
*Counsel of Record
JOSEPH S. ST. JOHN
  Deputy Solicitor General
LOUISIANA       DEPARTMENT
OF JUSTICE
1885 N. Third Street
Baton Rouge, LA 70802
Tel: (225) 326-6766
murrille@ag.louisiana.gov
stjohnj@ag.louisiana.gov

*Counsel for Appellees*

60

CHRISTOPHER M. CARR
Attorney General of Georgia
Stephen Petrany
Solicitor General
Office of the Attorney General
40 Capitol Square SW
Atlanta, GA 30334
(404) 458-3409
spetrany@law.ga.gov
*Counsel for the State of Georgia*

DANIEL CAMERON
Attorney General of Kentucky
Victor Maddox
Associate Attorney General
Kentucky Office of the Attorney
General
700 Capital Avenue, Suite 118
Frankfort, KY
Tel: (502) 696-5330
*Counsel for the State of Kentucky*

LYNN FITCH
Attorney General of Mississippi
Justin L. Matheny
Assistant Solicitor General
State of Mississippi
Office of the Attorney General P.O.
Box 220
Jackson, MS 39205
Tel: (601) 359-3680
*Counsel for the State of Mississippi*

Mark Miller
General Counsel to South Dakota
Governor Kristi Noem
500 East Capitol Avenue
Pierre, SD 57501-5070
Mark.Miller@state.sd.us
*Counsel for the State of South
Dakota*

KEN PAXTON
Attorney General of Texas
Brent Webster
First Assistant Attorney General
Judd E. Stone II
Solicitor General
Patrick Sweeten
Deputy Attorney General
Office of the Attorney General P.O.
Box 12548 (MC 009)
Austin, TX 78711-2548
Tel.: (512) 463-4139
Fax: (512) 474-2697
Patrick.Sweeten@oag.texas.gov
Judd.Stone@oag.texas.gov
*Counsel for the State of Texas*

PATRICK MORRISEY
West Virginia Attorney General
Lindsay S. See
Solicitor General
State Capitol, Bldg 1, Room E-26
Charleston, WV 25305
(304) 558-2021
Lindsay.s.see@wvago.gov
*Counsel for the State of West
Virginia*

BRIDGET HILL
Attorney General of Wyoming
James Kaste
Deputy Attorney General
Travis Jordan
Assistant Attorney General
Wyoming Attorney General's Office
109 State Capitol
Cheyenne, WY 82002
(307) 777-7895 (phone)
(307) 777-3542 (fax)
james.kaste@wyo.gov
travis.jordan@wyo.gov

**CERTIFICATE OF SERVICE**

I filed a true and correct copy of this brief with the Clerk of this

Court via the CM/ECF system, which will notify all counsel.

*/s/ Elizabeth B. Murrill*
Counsel for Appellees
Dated: June 16, 2022

## CERTIFICATE OF COMPLIANCE

This brief complies with Rule 32(a)(7)(B) because it contains 11,529 words, excluding the parts that can be excluded. This brief also complies with Rule 32(a)(5)-(6) because it has been prepared in a proportionally spaced face using Microsoft Word 2016 in 14-point Century Schoolbook font.

_/s/ Elizabeth B. Murrill_
Counsel for Appellees
Dated: June 16, 2022
