# United States Court of Appeals for the Fifth Circuit

United States Court of Appeals
Fifth Circuit
**FILED**
April 5, 2023
Lyle W. Cayce
Clerk

No. 22-30087

---

The State of Louisiana, *by and through its Attorney General, Jeff Landry*; The State of Alabama, *by and through its Attorney General, Steve Marchall*; The State of Florida, *by and through its Attorney General, Ashley Moody*; The State of Georgia, *by and through its Attorney General, Christopher M. Carr*; The Commonwealth of Kentucky, *by and through its Attorney General, Daniel Cameron*; The State of Mississippi, *by and through its Attorney General, Lynn Fitch*; The State of South Dakota, *by and through its Governor, Kristi Noem*; The State of Texas, *by and through its Attorney General, Ken Paxton*; The State of West Virginia, *by and through its Attorney General, Patrick Morrisey*; The State of Wyoming, *by and through its Attorney General, Bridget Hill*,

*Plaintiffs—Appellees*,

*versus*

Joseph R. Biden, Jr., *in his official capacity as President of the United States*; Cecilia Rouse, *in her official capacity as Chairwoman of the Council of Economic Advisers*; Shalanda Young, *in her official capacity as Acting Director of the Office of Management and Budget*; Kei Koizumi, *in his official capacity as Acting Director of the Office of Science and Technology Policy*; Janet Yellen, *Secretary, U.S. Department of Treasury*; Deb Haaland, *Secretary, U.S. Department of the Interior*; Tom Vilsack, *in his official capacity as Secretary of Agriculture*; Gina Raimondo, *Secretary, U.S. Department of Commerce*; Xavier Becerra, *Secretary, U.S. Department of Health and Human Services*; Pete Buttigieg, *in his official capacity as Secretary of Transportation*; Jennifer Granholm, *Secretary, U.S. Department of Energy*; Brenda Mallory, *in her official capacity as Chairwoman of the Council on Environmental Quality*; Michael S.

Regan, *in his official capacity as Administrator of the Environmental Protection Agency*; Gina McCarthy, *in her official capacity as White House National Climate Advisor*; Brian Deese, *in his official capacity as Director of the National Economic Council*; Jack Danielson, *in his official capacity as Executive Director of the National Highway Traffic Safety Administration*; United States Environmental Protection Agency; United States Department of Energy; United States Department of Transportation; United States Department of Agriculture; United States Department of Interior; National Highway Traffic Safety Administration; Interagency Working Group on Social Cost of Greenhouse Gases,

*Defendants—Appellants.*

---

Appeal from the United States District Court
for the Western District of Louisiana
USDC No. 2:21-CV-1074

---

Before Wiener, Higginson, and Wilson, *Circuit Judges*.

Jacques L. Wiener, Jr., *Circuit Judge*:

On January 20, 2021, the Biden Administration issued an executive order that re-established an interagency working group ("Working Group") to formulate guidance on the "social cost of greenhouse gases."[1] That order directed the Working Group to publish dollar estimates quantifying changes in carbon, methane, and nitrous oxide emissions (collectively, "greenhouse gases") for consideration by federal agencies when policymaking.[2] The

---

[1] *See* Exec. Order No. 13,990, § 5, 86 Fed. Reg. 7037 (Jan. 20, 2021) ("E.O. 13990").

[2] *Id.*

No. 22-30087

Working Group has since published "Interim Estimates" based largely on the findings of its predecessor working group.[3]

The Plaintiffs-Appellees States ("Plaintiffs") challenge E.O. 13990 and the Interim Estimates as procedurally invalid, arbitrary and capricious, inconsistent with various agency-specific statutes, and *ultra vires*. They obtained a preliminary injunction in the district court.[4] Defendants-Appellants ("Defendants") appealed, and a panel of this court stayed the injunction.[5]

We now dismiss this action because Plaintiffs have failed to meet their burden to prove standing. Plaintiffs' allegations of "injury in fact" rely on a chain of hypotheticals: federal agencies may (*or may not*) premise their actions on the Interim Estimates in a manner that may (*or may not*) burden the States. Such injuries do not flow from the Interim Estimates but instead from potential future regulations, i.e., final rules that are subject to their own legislated avenues of scrutiny, dialogue, and judicial review on an appropriately developed record.

## I. Background

Presidents have long overseen federal agencies by requiring cost-benefit analyses for review, both internally and by the public.[6] This practice

---

[3] Working Group, Technical Support Document: Social Cost of Carbon, Methane, and Nitrous Oxide, Interim Estimates Under Executive Order 13990 (Feb. 26, 2021) [hereinafter Interim Estimates].

[4] *Louisiana v. Biden*, 585 F. Supp. 3d 840 (W.D. La. 2022).

[5] *Louisiana v. Biden*, 2022 WL 866282 (5th Cir. Mar. 16, 2022).

[6] "President Carter issued Executive Order 12,044 requiring cost-benefit analyses (CBA) for rules with 'major economic consequences.' These early oversight efforts anticipated two key objectives of current presidential review structures: improving the quality and rationality of agency analysis, and ensuring agency consistency with broader presidential priorities." Nina A. Mendelson, Jonathan B. Wiener, *Responding to Agency Avoidance of OIRA*, 37 Harv. J.L. & Pub. Pol'y 447, 455 (2014).

is a general administrative control employed by presidents to carry out their duty to "take Care that the Laws be faithfully executed."[7] The Reagan Administration assigned this oversight to the Office of Management and Budget ("OMB"),[8] and the Clinton Administration formally established the existing regime of cost-benefit analysis: Before proposing any significant action,[9] federal agencies must assess the costs and benefits of the regulation and submit the resulting assessments to OMB's Office of Information and Regulatory Affairs ("OIRA") for review.[10]

OMB has historically issued guidance to federal agencies regarding this process. One such document, "Circular A-4," was issued in 2003 as a compilation of regulatory best practices.[11] Relevant here, Circular A-4 recommends that federal agencies (1) consider domestic, rather than global, costs and benefits,[12] and (2) use discount rates of 3 and 7 percent.[13] But OMB

---

[7] U.S. CONST. art. II, § 3; *see Seila Law LLC v. Consumer Fin. Prot. Bureau*, 140 S. Ct. 2183, 2197 (2020) (quoting U.S. CONST. art. II) ("The entire 'executive Power' belongs to the President alone.").

[8] Exec. Order No. 12,291, 46 Fed. Reg. 13,193 (Feb. 17, 1981).

[9] Significant actions include those that are "likely to result in a rule that may . . . [h]ave an annual effect on the economy of $100 million or more." Exec. Order No. 12,866, § 3(f)(1), 58 Fed. Reg. 51,735 (Sept. 30, 1993).

[10] *Id.* § 6(a)(3)(B)-(C). If an agency proceeds to justify an action with a resulting cost-benefits assessment, it is subject to challenge under the Administrative Procedure Act. *See Nat'l Ass'n of Home Builders v. EPA*, 682 F.3d 1032, 1040 (D.C. Cir. 2012) ("[W]hen an agency decides to rely on a cost-benefit analysis as part of its rulemaking, a serious flaw undermining that analysis can render the rule unreasonable.")

[11] OMB, CIRCULAR A-4 (Sept. 17, 2003).

[12] "Your analysis should focus on benefits and costs that accrue to citizens and residents of the United States. Where you choose to evaluate a regulation that is likely to have effects beyond the borders of the United States, these effects should be reported separately." *Id.* at 15.

[13] "Benefits or costs that occur sooner are generally more valuable" because people "plac[e] a higher value on current consumption than on future consumption." *Id.* at 32.

No. 22-30087

expressly does not bind agencies to its methodologies. Circular A-4 warns that agencies must "exercise professional judgment" using the best evidence available.[14]

*A. The Working Group on the Social Cost of Greenhouse Gases*

For more than a decade, federal agencies have considered the effects of greenhouse gas emissions among a panoply of variables in their cost-benefit analyses.[15] They did so on their own terms with each agency considering and determining its own estimate of such costs based on studies they deemed appropriate.[16] That changed in 2009 when the Obama Administration took action to standardize such estimates. An interagency working group ("Prior Working Group") was formally convened to develop a transparent and defensible method, designed for the rulemaking process, to quantify the social costs of greenhouse gases.[17] The Prior Working Group derived estimates from peer-reviewed models for translating emissions into dollars. This work product was subject to public notice and comment, and to review by the National Academies of Sciences, Engineering and Medicine

---

"To reflect this preference, a discount factor should be used to adjust the estimated benefits and costs for differences in timing. The further in the future the benefits and costs are expected to occur, the more they should be discounted." *Id.*

[14] *Id.* at 26-27.

[15] *See* INTERAGENCY WORKING GROUP ON SOCIAL COST OF CARBON, TECHNICAL SUPPORT DOCUMENT: SOCIAL COST OF CARBON FOR REGULATORY IMPACT ANALYSIS UNDER EXECUTIVE ORDER 12866, at 3-4 (Feb. 2010) (collecting examples of agency analysis of greenhouse gas emissions from 2008).

[16] *Id.*

[17] *Id.* at 1-2.

("National Academies"). All told, the process concluded in January 2017 when a final report was issued by the National Academies.[18]

In March of 2017, the Trump Administration signaled a change in policy and disbanded the Prior Working Group.[19] Its work product was withdrawn as "no longer representative of governmental policy,"[20] but federal agencies were not barred from "monetizing the value of changes in greenhouse gas emissions resulting from regulations."[21] Instead, agencies reverted to making their own individualized estimates in a manner "consistent with the guidance contained in OMB Circular A-4."[22]

That brings us to the subject of this challenge. In January 2021, the Working Group was reconvened by the Biden Administration through executive order.[23] That Working Group was tasked with developing Interim Estimates, "appropriate and consistent with applicable law," to be published for use until revised estimates were issued to address the recommendations of the National Academies.[24] Other than adjustments for inflation, the Interim Estimates reflected the Prior Working Group's 2016 findings.[25] OIRA issued complementary guidance around that time: "When an agency

---

[18] NATIONAL ACADEMIES, VALUING CLIMATE DAMAGES: UPDATING ESTIMATION OF THE SOCIAL COST OF CARBON DIOXIDE (2017).

[19] Exec. Order No. 13,783, § 5(b), 82 Fed. Reg. 16,093 (Mar. 28, 2017).

[20] *Id.* § 5(b).

[21] *Id.* § 5(c).

[22] *Id.*

[23] *See* Exec. Order No. 13,990, § 5.

[24] *Id.* § 5(b)(ii).

[25] Notice of Availability and Request for Comment on "Technical Support Document: Social Cost of Carbon, Methane, and Nitrous Oxide Interim Estimates Under Executive Order 13990", 86 Fed. Reg. 24,669 (May 7, 2021).

conducts benefit-cost analysis pursuant to specific statutory authorities," those statutory provisions "must dictate whether and how the agency monetizes changes in greenhouse gas emissions in the context of the agency action."[26] When a federal agency relies on the Interim Estimates to justify a final action, it "must respond to any significant comments on those estimates and ensure its analysis" is "not arbitrary or capricious."[27]

### B. Ensuing Challenges

On April 22, 2021, Plaintiffs filed the instant suit in the Western District of Louisiana, contending that E.O. 13990 and the Interim Estimates are procedurally invalid, arbitrary and capricious, inconsistent with various agency-specific statutes, and *ultra vires*.[28] This action does not directly challenge any specific regulation resulting from the Interim Estimates.

On February 11, 2022, the district court granted Plaintiffs' motion for preliminary injunction and adopted their proposed order for injunctive relief.[29] That court enjoined all Defendants from (1) adopting, employing, treating as binding, or relying on the work product of the Working Group; (2) using any estimates that are based on global effects, that do not use discount rates of 3 and 7 percent, or do not comply with Circular A-4; and (3) relying on or implementing Section 5 of Executive Order 13990 in any manner.

---

[26] OIRA, SOCIAL COST OF GREENHOUSE GAS EMISSIONS: FREQUENTLY ASKED QUESTIONS (June 3, 2021).

[27] *Id.*

[28] A similar challenge was brought in the Eastern District of Missouri in March 2021. There, the district court dismissed the action for lack of standing. *Missouri v. Biden*, 558 F. Supp. 3d 754 (E.D. Mo. 2021). On October 21, 2022, the Eighth Circuit affirmed. *Missouri v. Biden*, 52 F.4th 362, 366 (8th Cir. 2022).

[29] *Louisiana*, 585 F. Supp. 3d at 870.

Defendants appealed and moved this court to stay the district court's preliminary injunction pending appeal. A panel of this court granted the stay.[30] This court declined to rehear the issue, and on May 26, 2022, the Supreme Court declined to intervene.[31]

## II. LAW AND ANALYSIS

We begin and end with standing.[32] "Standing to sue is a doctrine rooted in the traditional understanding of a case or controversy."[33] This doctrine "serves to prevent the judicial process from being used to usurp the powers of the political branches," and our review is "especially rigorous when reaching the merits of the dispute would force us to decide whether an action taken by one of the other two branches of the Federal Government was unconstitutional" as Plaintiffs request here.[34]

It is Plaintiffs' burden to establish standing.[35] Plaintiffs must clearly allege that they "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision."[36] Plaintiffs' alleged injury must be

---

[30] *Louisiana*, 2022 WL 866282, at *3.

[31] *Louisiana v. Biden*, 142 S. Ct. 2750 (2022) ("Application to vacate stay presented to Justice Alito and by him referred to the Court denied.").

[32] *See Ordonez Orosco v. Napolitano*, 598 F.3d 222, 225 (5th Cir. 2010) (reviewing for standing *de novo*).

[33] *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016).

[34] *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 408 (2013).

[35] *Summers v. Earth Island Inst.*, 555 U.S. 488, 493 (2009).

[36] *Spokeo*, 578 U.S. at 338.

No. 22-30087

"'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'"[37] "Allegations of *possible future* injury" will not suffice.[38]

Plaintiffs here allege that fiscal, procedural, and sovereignty-related harms might arise from regulations molded by the Interim Estimates. Although any one of these would satisfy "injury in fact," we conclude that the allegations here fail to do so. At the core of our conclusion is this: E.O. 13990 does not *require* any action from federal agencies. Agencies are neither punished nor rewarded for their treatment of the Interim Estimates. Agencies must exercise discretion in conducting their cost-benefit analyses and deciding to use the Interim Estimates as "appropriate and consistent with applicable law."[39] Since nothing in E.O. 13990 requires States to implement the Interim Estimates, Plaintiffs rely on harms wrought by regulations that *may* result from the Interim Estimates. It is well accepted that the mere "possibility of regulation" fails to satisfy injury in fact.[40]

Plaintiffs allege direct fiscal and economic harms from the Interim Estimates because the resulting regulations would burden the States, especially when "exercising their cooperative federalism functions and administering environmental and energy regulatory programs," and would

---

[37] *Id.* at 339 (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992)).

[38] *Clapper*, 568 U.S. at 409 (emphasis added).

[39] *See* Exec. Order No. 13,990, § 5(b)(ii).

[40] *National Ass'n of Home Builders*, 667 F.3d at 13 ("[Plaintiffs] face only the *possibility* of regulation. . . . Any watercourse on their property may (or may not) turn out to be subject to CWA dredging permit requirements because of a nexus (or not) with the two Santa Cruz reaches"); *see Summers*, 555 U.S. at 496 (finding no standing when the challenged procedures "neither require nor forbid any action on the part of respondents. . . [and instead] govern only the conduct of . . . officials engaged in project planning.").

impact the prices of "more heavily regulated goods and services."[41] Their citizens and industries would also be harmed by any resulting "job-killing regulations" and restrictions on chemical manufacturing.[42] Plaintiffs' allegations of harm are generally broad, but they describe two instances of injury in practice: First, the Environmental Protection Agency ("EPA") is alleged to have indirectly "coerc[ed] the States to use" the Interim Estimates through a "final rule imposing more stringent . . . Federal Implementation Plans" under the National Ambient Air Quality Standards ("NAAQS"). Second, the Interim Estimates would increase the cost estimates of oil-and-gas lease sales under the National Environmental Policy Act ("NEPA").

We find no "injury in fact" here, because Plaintiffs' alleged harms "rel[y] on a highly attenuated chain of possibilities."[43] A federal agency must factor the Interim Estimates into its deliberations on a rule that harms the States. The actual rulemaking considerations of a federal agency are not determinable in advance. Rather, an agency's reliance on the Interim Estimates when crafting a future regulation is mere conjecture.[44] Although

---

[41] *See Watt v. Energy Action Educ. Found.*, 454 U.S. 151, 160-61 (1981) ("In alleging that the bidding systems currently used by the Secretary of the Interior are incapable of producing a fair market return, California asserts the kind of 'distinct and palpable injury,' that is required for standing."); *see also El Paso Cty., Texas v. Trump*, 982 F.3d 332, 339 (5th Cir. 2020) ("The Supreme Court held that Wyoming had standing to sue because the Oklahoma law caused Wyoming 'a direct injury in the form of a loss of specific tax revenues.'").

[42] *See Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez*, 458 U.S. 592, 607 (1982) ("One helpful indication in determining whether an alleged injury to the health and welfare of its citizens suffices to give the State standing to sue *parens patriae* is whether the injury is one that the State, if it could, would likely attempt to address through its sovereign lawmaking powers.").

[43] *Clapper*, 568 U.S. at 410.

[44] *ASARCO Inc. v. Kadish*, 490 U.S. 605, 614-15 (1989) ("[C]ourts cannot presume either to control or to predict" how agency discretion will be exercised.).

we have found standing when the economic costs of a challenged policy were imminent and measurable,[45] the Interim Estimates are not certain to spawn the alleged harms. A panoply of reasons can underlie a regulation, and agencies are required to dictate and publicly report such reasons.[46] It is through this process that we know that neither of Plaintiffs' specific examples of injurious regulation were brought about by the Interim Estimates: In both instances, the relevant agencies reported that their decisions were not

---

[45] *See Texas v. United States*, 40 F.4th 205, 216 (5th Cir. 2022) (challenging Department of Homeland Security memoranda that established specific agency-wide procedures and created immediate measurable effects on immigration enforcement), *cert. granted*, 143 S. Ct. 51 (Mem) (July 21, 2022) (including issue of "[w]hether the state plaintiffs have Article III standing"). Neither party has requested that we hold the instant case for the pending decision in *Texas v. United States*, 143 S. Ct. 51, nor do we think that delay is necessary: The Court will either affirm this Circuit's decision on standing—where plaintiff states presented a meticulous list of immediate injuries in stark contrast to our case—or reverse, which sets a more stringent bar for standing in this matter.

[46] SOCIAL COST OF GREENHOUSE GAS EMISSIONS: FREQUENTLY ASKED QUESTIONS, at 2 (Federal agencies must "dictate whether and how the agency monetizes changes in greenhouse gas emissions in the context of the agency action.").

premised on those Estimates.[47] The alleged harms would have occurred with or without the Interim Estimates.[48]

Plaintiffs' deficiencies parallel those found by the Supreme Court in the seminal case, *Summers v. Earth Island Institute*, where plaintiffs failed to identify any specific "application of the challenged [United States Forest Service] regulations."[49] Specifically, plaintiffs fell short of their need to allege how "*any* particular timber sale or other project claimed to be unlawfully subject to the regulations will impede a specific and concrete plan of [plaintiffs'] to enjoy the national forests."[50] Here, Plaintiffs point to financial harm related to their oil and gas leasing projects but fail to allege any

---

[47] *See* Bureau of Land Management, DOI-BLM-UT-0000-2021-0007-EA, Decision Record, *Utah 2022 First Competitive Oil and Gas Lease Sale* 2 (June 2022) ("The [Environmental Assessment] analyzes emissions and the social cost thereof for informational purposes only, and BLM has not determined to lease individual parcels (or not) based on greenhouse gas emissions."); *see also* 81 Fed. Reg. 53,308 (Aug. 12, 2016) ("disapproving the portion of a Louisiana State Implementation Plan (SIP) submittal pertaining to interstate transport of air pollution which will significantly contribute to nonattainment or interfere with maintenance of the 2008 ozone [NAAQS] in other states"); 81 Fed. Reg. 53,284 (Aug. 12, 2016) ("disapproving the portion of a Texas State Implementation Plan (SIP) submittal pertaining to interstate transport of air pollution which will significantly contribute to nonattainment or interfere with maintenance of the 2008 ozone [NAAQS] in other states"); 78 Fed. Reg. 14,681 (Mar. 7, 2013) ("disapprov[ing] Kentucky . . . SIP submission with respect to certain interstate transport requirements for the 2008 8-hour ozone NAAQS because the submission does not address the statutory provisions with respect to the relevant NAAQS").

[48] *See Sierra Club v. FERC*, 827 F.3d 59, 68 (D.C. Cir. 2016) ("As a procedural statute, NEPA does not mandate any particular outcome."); *see also* Revised Cross-State Air Pollution Rule Update for the 2008 Ozone NAAQS, 86 Fed. Reg. 23,054, 23,086-87 (explaining the multi-factor considerations for NAAQS).

[49] *Summers*, 555 U.S. at 495.

[50] *Id.*

specific lease or project that was rejected due to the Interim Estimates,[51] and their remaining allegations stand on similar footing.[52] Because Plaintiffs continue to rely on hypothetical harms, we find no reason to depart from the Eighth Circuit's parallel ruling in *Missouri v. Biden* that a coalition of plaintiff states had no standing to challenge E.O. 13990 and the Interim Estimates.[53]

Plaintiffs contend that they suffered a procedural injury because they could not comment on the Interim Estimates, but it is well established that the "deprivation of a procedural right without some concrete interest that is affected by the deprivation—a procedural right *in vacuo*—is insufficient to create Article III standing."[54] Merely being "denied the ability to file comments" is "insufficient to create Article III standing."[55] This alleged harm stands *in vacuo*, because the Interim Estimates, alone and without further action from an agency, will not cause concrete harm. Plaintiffs bring this action without challenging any specific agency action. If any harms should stem from a resulting regulation, Plaintiffs are afforded avenues to bring challenges when the extent of the Interim Estimates' use in rulemaking

---

[51] Plaintiffs could not name any lease or project that was rejected by virtue of the Interim Estimates at oral argument either.

[52] When queried at oral argument about the "best example of final agency action that has caused concrete injury to a plaintiff state in this case," Plaintiffs identified the contents of an affidavit by the South Dakota Department of Transportation Secretary. But the declaration's assertion of harm is speculative and nonspecific. In fact, the affidavit does not rely on the Interim Estimates' figures but instead a federal "request[]" that South Dakota develop a state-level greenhouse gas analysis. This evidence—apparently plaintiffs' best—does not show injury nor traceability to the challenged action. When pressed further, Plaintiffs' counsel stated that they've sufficiently pointed to "the application of BLM across the board to all their oil and gas leasing program to which [the Plaintiffs] are a part." This situation strikingly mirrors the deficient pleadings in *Summers*.

[53] 52 F.4th at 365–66.

[54] *Summers*, 555 U.S. at 496.

[55] *Id.*

is clear—not merely hypothetical—and is amenable to rigorous judicial review.

Plaintiffs' final attempt to identify injury stems from their sovereignty which—under some circumstances—warrants a "special solicitude in the standing analysis."[56] They contend that the Interim Estimates "deprive the [s]tates of freedom and discretion that they otherwise would have had in administering [cooperative] programs . . . [and] does not depend on the impact of a future agency action, because it immediately affects how States participate in formulating agency actions." However, this case lacks the hallmarks of a state's "special solicitude" for a familiar reason: Neither E.O. 13990 nor the Interim Estimates have a direct effect on Plaintiffs' law or policy. E.O. 13990 dictates that the Interim Estimates apply only to federal "executive departments and agencies."[57] The Interim Estimates provide no "substantial pressure" for Plaintiffs to change *their* laws.[58] Regardless of the applicability of the special solicitude, Plaintiffs must still satisfy the basic requirements of standing which, as discussed, they do not.[59]

Since Plaintiffs fail to establish injury in fact, we need not address the remaining factors for standing. We observe, however, that traceability fails for similar reasons.[60] E.O. 13990 does not itself mandate any particular

---

[56] *See Massachusetts v. EPA*, 549 U.S. 497, 519 (2007).

[57] Exec. Order No. 13,990, § 1.

[58] *See Texas v. United States*, 809 F.3d 134, 153 (5th Cir. 2015) ("[S]tates have a sovereign interest in 'the power to create and enforce a legal code.'").

[59] *See Massachusetts*, 549 U.S. at 521; *see also Arizona v. Biden*, 31 F.4th 469 (6th Cir. 2022) (Special solicitude "does not allow [States] to bypass proof of injury in particular or Article III in general").

[60] *See California v. Texas*, 141 S. Ct. 2104, 2113 (2021) (The second element of standing requires that any alleged injury is "'fairly traceable' to the 'allegedly unlawful conduct' of which they complain.").

regulatory action by a federal agency. In Plaintiffs' own words, these estimates would be used to merely "*justif[y]*" harmful regulations. Such harms are traceable to possible agency actions, not to E.O. 13990 or the Interim Estimates.

We conclude that Plaintiffs have not established standing here, which ends our analysis. Plaintiffs contemplate harms that are several steps removed from—and are not guaranteed by—the challenged Executive Order or the Interim Estimates. The states cannot do away with their alleged parade of horribles in a single swipe at the duly elected executive. Although the "case-by-case approach that this requires is understandably frustrating [to plaintiffs]," this remains the "the traditional, and remains the normal, mode of operation of the courts."[61]

### III. Conclusion

This is action is DISMISSED for lack of jurisdiction, and the district court's preliminary injunction is VACATED.

---

[61] *Lujan,* 497 U.S. at 894 ("[M]ore sweeping actions are for the other branches.").